OVERTON, J.
 

 The purpose of this suit is to effect a reduction of plaintiff’s general property assessment at Destrehan, La., for the year 1929, from $2,085,720 to $1,155,673.34, by eliminating from the assessment an item of $626,448.-28, representing imported crude oil, an item of $1,705.13, representing imported rape seed oil, and an item of $301,895, alleged to be in excess of the actual cash value of the property subject to taxation, on January 1, 1929.
 

 The crude oil was imported in bulk from Mexico and Venezuela, mostly from the latter country, and the rape seed oil was imported in barrels, in which it remained, from England.
 

 The reason for seeking to eliminate the crude oil and the rape seed oil is that they
 
 *607
 
 are imports, and hence, under paragraph 2 of section 10 of article 1 of the Constitution .of - the United States, prohibiting a state, .without the consent of Congress, from laying imposts or duties on imports or exports, except, so far as necessary to execute its inspection laws, these oils, which it is urged still remain in their original condition, are exempt from state or local taxation.
 

 The reason for seeking to eliminate the item of $301,895 is that the assessment, to that extent, is in excess of the actual cash ■value of the property, as of date January 1; 1929, the day to be used in making the assessment for the calendar year. 1929.
 

 There was judgment in the trial court, reducing the assessment by eliminating the items complained of, as prayed for by plaintiff.
 

 ■ Within the time prescribed by law defendant filed its sworn return with the assessor for assessment purposes. This return, inter alia, showed:
 

 Merchandise ................. $940,711.42
 

 Materials and supplies......... 214,961.92
 

 Total 81,155,673.34
 

 These items do not include the items of imported crude oil and imported rape seed oil, for the reason that they were thought to be exempt from taxation as imports, though they were shown in the return as exempt. The assessor accepted the return as correct, but not so with.the Louisiana Tax Commission.' The commission increased the assessment of the item of merchandise, shown in the return, by adding to it the sum of $930,-048; the increase consisting of the items of imported crude and rape seed oil, aggregating $628,153.41, and the item of $301,895, representing an increase in the items of merchándise and materials and supplies, ■ as shown in plaintiff’s return. •
 

 In reaching the amount for which plaintiff should be assessed for the calendar year 1929, on merchandise and materials and supplies, the commission averaged the amount of these two items on hand on January. 1, 1928, and the amount on hand on December 31, 1928. This- method 'showed an increase of $301,895 over plaintiff’s- return on these items. The commission also included as taxable, at the valuation placed thereon by plaintiff in its return, the items of imported crude and rape seed oil, aggregating $628,153.41, which, together with the increase on merchandise, material, and supplies, raised plaintiff’s assessment to $2,085,724.74.
 

 In-assessing property, it is well established ■ that it must be assessed on the basis of the condition of things as they'existed on January 1, of the calendar year for which the property is to be assessed and taxed. Louisiana Oil Refining Company v. Louisiana Tax Commission, 167 La. 605, 120 So. 23; Gulf Public Service Company v. Louisiana Tax Commission, 167 La. 757, 120 So. 286. As to .the manner of arriving at the value of the merchandise and thé like' on hand, the rule seems to be that, where the amount of such property may be reasonably ascertained as of date January the 1st of the year in which the assessment is to be made, which is the supposed date of listing, then that amount should be accepted as the basis for the assessment, but, when it is not practicable to arrive at the amount as of that date, then the assessing authorities are authorized to take as a basis for such purpose the average amount of stock on hand for tlie preceding year. Since property is to be assessed on the basis of the condition of things as of a specified date, it would seem 'that, where reasonably ascertainable, the • condition of things on that date would lead to a more correct assessment than by striking an
 

 
 *609
 
 average of the amount of property on hand, namely, merchandise and the like, of the previous year.
 

 In this instance, the amount of merchandise, materials, and supplies, as of date January 1, 1929, was reasonably ascertainable. In fact, the commission had, in its possession, the sworn return of plaintiff, showing the amount of this property on hand, on January 1,1929. This return is supported by witnesses, testifying on the trial. While the findings of the commission are entitled to considerable weight, it appears to us that the return on these items should have been accepted as the correct amount for the assessment, as to them.
 

 The only circumstance which tended to cast, at any time, suspicion on the correctness of the return of plaintiff, appears from a memorandum, sent the commission by plaintiff, from which there appears a discrepancy between the memorandum and the return of $64,019.37, against plaintiff's contention, but this suspicion is fully dissipated by the explanation and the proof that this amount represented products of plaintiff, which were shipped from Louisiana in November and December, 1928, and hence, were not in the state on January 1, 1929, and therefore were beyond the taxing powers of the state.
 

 Our conclusion is that, not only was the amount of merchandise and the like reasonably ascertainable, as of date January 1, 1929, but the commission had the correct amount before it, and therefore was not justified in resorting to ascertaining an average of the amount on hand in the previous year as a basis for the assessment for the succeeding year.
 

 The oil from Mexico and Venezuela was imported, in bulk, in tank ships, by plaintiff. When it reached Destrehan it was pumped through pipes into land tanks. As oil thickens in the tanks on the ships when it remains in them for two or three days, for the purpose of pumping it from the ships, it becomes necessary to make the oil more liquid by heating it, so that it will flow sufficiently. This is done by means of steam coils with which the ship is usually equipped. The Venezuela oil, known as Lago, and the Mexican oil, known as Ebano, are pumped into separate tanks, set aside for the purpose of receiving them. The Lago and the Ebano are of different grades, and are never mixed. It would be impracticable, and would result in loss, to mix them, due to the fact that different products are manufactured from them. Neither is ever mixed with domestic oils. However, when the oil is pumped into tanks, it is usually pumped into tanks containing about 1,000 barrels of imported oil of the same kind as that pumped into them. This is so because in the ordinary course of withdrawing oil from the tanks for the purpose of refining it into its various products, it seems to be impossible, or, at least, impracticable, to draw below the 1,000-barrel mark. After the oil reaches the tanks, it remains in them, until needed for refining purposes, in the same condition in which it was when delivered in the tanks.
 

 Crude oil is imported only in bulk, because it would increase the cost to such an extent to import it in barrels or casks that its importation would not be practicable, but rather prohibitive. The rape seed oil, which is used in making greases and oils, was imported by plaintiff from England. It no longer plays a part in this case, for defendant concedes that, since it was in plaintiff’s warehouses, in the unbroken packages in which it was imported, on January 1, 1929, as of which date the listing for taxation is required to be made, it is not subject to taxation for the year 1929.
 

 
 *611
 
 Paragraph 2 of section 10 of article 1 of the Constitution of the United States reads:
 

 “No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may he absolutely necessary for executing its inspection Laws.”
 

 The Articles of Federation did not contain such a provision. Hamilton, in the Federalist, vol. 1, p. 45, in presenting to the people of New York the clause, in discussing the necessity for the adoption of the Constitution, said:
 

 “The opportunities which some States would have to render others tributary to them by commerical regulation would be impatiently submitted to by the tributary states. Relative situations of New York, Connecticut and New Jersey would afford an example of this kind. New York, from the necessity of revenue, must lay duties on her importations. A great part of these duties must be paid by the inhabitants of the two other states in the capacity of consumers of what we import. New York would neither be willing nor able to forego this advantage. Her citizens would not consent that a duty paid by them should be remitted in favor of the citizens of her neighbors; nor would it be practicable, if there were
 
 not
 
 this impediment in the way,
 
 to
 
 distinguish the customers in our markets. Would Connecticut and New Jersey long submit to be taxed by New York for her exclusive benefit? Should we be long permitted to remain in the quiet and undisturbed position of a metropolis, from the position of which we derive an advantage, so odious to our neighbors, and, in their opinion, so oppressive? Should we be able to preserve it against the weight of Connecticut on the one side and the cooperating pressure of New Jersey on the other? These are questions that temerity alone will answer in the affirmative.” See, also, in this connection, Madison’s comments on the result of the absence of such a clause from the Articles of Federation. Madison’s Papers, vol. 2, pp. 691, 711.
 

 In Brown v. Maryland, 12 Wheat. 419, 441, 6 L. Ed. 678, the leading case on this clause of the Constitution, upon which the jurisprudence under the clause largely rests, it was said through Judge Marshall that:
 

 “The constitutional prohibition on the states to lay a duty on imports — a prohibition which a vast majority of them must feel an interest in preserving — may certainly come in conflict with their acknowledged power to tax persons and property within their territory. The power, and the restriction on it, though quite distinguishable when they do not approach each other, may yet, like the intervening colors between white and black, approach so nearly as to perplex the understanding, as colors perplex the vision in marking the distinction between them. Yet the distinction exists, and must be marked as the cases arise. Till they do arise, it might be premature to state any rule as being universal in its application. It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the constitution. * *
 
 * ”
 

 In The License Cases, 5 How. 504, 575, 12 L. Ed. 256, it was said:
 

 “Indeed, goods imported, while they remain in the hands of the importer, in the form and shape in which they were brought into the
 
 *613
 
 country, can in no just sense be regarded as a part of that mass of property in tbe State usually taxed for the support of the State government. * * * ” And, in the same cases, it was said that: “A tax in any shape upon imports is a tax on the consumer, by enhancing the price of the commodity. And if a State is permitted to levy it in any form, it will put it in the power of a maritime importing State to raise a revenue for the support of its own government from citizens of other States, as certainly and effectually as if the tax was laid openly and without disguise as a duty on imports. Such a power in a State would defeat one of the principal objects of forming and adopting the constitution. * * * ”
 

 In Sonneborn Bros. v. Cureton, 262 U. S. 506, 43 S. Ct. 643, 644, 67 L. Ed. 1095, it was said:
 

 “It is the article itself to which the immunity attdches and whether it is in transit or is at rest, so long as it is in the form and package in which imported and in the custody and ownership of the importer, the state may not tax it.”
 

 Unless, because the crude oil was brought to rest in the tanks of plaintiff, at Destrehan, to be there refined, and its products, such as gasoline, kerosene, and asphalt, sold, or unless, because the oil could not be imported in packages, with any degree of practicability, but had to be imported in bulk and pumped from the ships into land tanks to make its importation practicable for commercial purposes, or unless, because the oil was heated by means of steam coils, in order to make it sufficiently liquid to flow with enough ease to pump it, in delivering it into the land tanks, or unless, because the oil was pumped, in delivering it at Destrehan, into tanks, containing each about 1,000 barrels of imported oil of the same kind, quality, and grade as that being delivered plaintiff, it, by one or more of these acts, lost its character as an import, then it would seem clear, under the authorities cited, that the oil retained such character, and therefore was not subject to state taxation.
 

 It is obvious, under the authorities cited, and especially under Sonneborn Bros. v. Cureton, 262 U. S. 506, 43 S. Ct. 643, 67 L. Ed. 1095, that, because the oil came to a state of rest at Destrehan to be there refined, it did not lose its character as an import. A more important question concerns the manner of importation. Our appreciation of Brown v. Maryland, and the authorities, cited, resting upon it, is not that the property must be imported necessarily in packages to be in a situation, after delivery, to retain its character as an import, but, where such is not the manner of importation, it suffices that the import, to retain its character as such, remain in the original form in which imported. Some property is of such a physical nature that it is inexpedient, unwise, or too costly to import it in packages. It was not the intention, however, to exclude such property from the immunities of imports. Of this nature is crude oil. The only practicable way of importing it is in bulk. To import it in barrels would make the oil too costly to be used in general commerce, whether for heating purposes, or for the manufacture of the important articles of gasoline, kerosene, asphalt, or other products. It is obvious that to deprive such importations of their immunities as imports would be a blow to the great oil industry of the country, and, as a result, to the people thereof. The import clause of the Constitution was not so intended or designed.
 

 As the usual way of importing crude oil • is in bulk in tank ships, and since, in our view, it may be so imported without destroying its character as an import, it would seem
 
 *615
 
 to follow, as an incident, that, in order to deliver the oil, it may be pumped from the tanks in the ship into the tanks on land, and that such process — the only practical process known — would not destroy its original bulk form of importation.
 

 It would seem also that the heating of the oil to make it flow, so that it might be pumped into the land tanks from the tanks on .the ship is not, within the contemplation of Brown v. Maryland, such an acting upon the thing imported as to incorporate or mix it up with the mass of property in the country, and the same is true within the contemplation of Gulf Fisheries Co. v. MacInerney, 276 U. S. 124, 48 S. Ct. 227, 72 L. Ed. 495.
 

 The case last cited arose over the importation into the state of Texas of fish caught in the Gulf of Mexico. The fish were landed in bulk by the fishing boats on the wharf of the company. After the fish were landed, they were immediately reiced to prevent spoiling; about 75 per cent, were beheaded and gutted: 7 to 10 per cent, were beheaded and gilled, the remaining were left for sale. All but 15 pr 20 per cent., which were sold to wholesale dealers in Galveston, were put loosely in barrels with ice, ready for shipment for filling orders.
 

 In that case, the fish were acted upon in' -such á manner, after delivery, as to incorporate them into the general mass of property in the country, and it was so held. In the case before us, such, in our view, was not the case. The oil was not acted upon in the tanks after delivery. It was merely stored there until needed for refining purposes. The only thing done to it, after it was put on the vessels, was to heat it, in order to complete the importation by delivering the oil on land.
 

 The circumstance of pumping the oil into tanks, in unloading it, containing each about 1,000 barrels of oil of the kind and quality pumped into it — a circumstance which could not be practically avoided in the ordinary course of things — did not cause the oil to lose its character as an import. There was no change here in the oil' through a process of mixing, for the oil put in each tank was identical in kind and grade with that already in it. Besides, the record justifies the conclusion that the oil already in the tanks was oil imported by plaintiff, and still retained its character as- an import, and hence there was no mixing of the oil with oil that had become incorporated into the general mass of the property of the country.
 

 We have not overlooked the authorities, cited by defendants, not expressly, noticed herein, including the case of East Ohio Gas Company v. Tax Commission of Ohio, 283 U. S. 465, 51 S. Ct. 499, 75 L. Ed. 1171, referred to by defendants in oral argument, and decided May 18, 1931, by the Supreme Court of the United States. We find that most of them relate to interstate shipments, involving largely such questions as when interstate shipments cease to be such or come to an end, and have no particular pertinency here (Cooley on Taxation, vol. 1, § 383, p. 820), and, as to the rest, not expressly noticed, the facts are so different, save as to one, as to render them inapplicable.
 

 The case excepted is that of Mexican Petroleum Corporation v. City of South Portland, 121 Me. 128, 115 A. 900, 26 A. L. R. 965. That case is directly pertinent to the case at bar, but we are not in accord with it. It was there held, which we regard as erroneous, that the tank steamer and the oil constituted the original package, and that the withdrawal of the oil from the steamer, caused the oil to lose its character as an import. The package and the carrier cannot be the same, for then a delivery of the oil would involve a delivery of the carrier.
 

 The judgment is affirmed.