[Civ. No. 24762. First Dist., Div. One. Apr. 4, 1969.]

AMERICAN SMELTING AND REFINING COMPANY, Plaintiff and Respondent, v. COUNTY OF CONTRA COSTA et al., Defendants and Appellants.

438

John A. Nejedly, District Attorney, John B. Clausen, Acting District Attorney, Howard T. Gonsalves and Arthur W. Walenta, Jr., Deputy District Attorneys, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and John J. Klee, Jr., Deputy Attorney, as Amici Curiae on behalf of Defendants and Appellants.

Valentine Brookes, Paul E. Anderson, Charles S. Franklin and Kent, Brookes & Anderson for Plaintiff and Respondent.

SIMS, J.—The County of Contra Costa and its officials charged with the levy, assessment, collection and cancellation of property taxes have appealed from a judgment which granted the American Smelting and Refining Company a

peremptory writ of mandate commanding appellants to cancel an allegedly illegal property tax assessment, and an injunction permanently restraining the collection of property taxes levied on that assessment.[1] The assessment, made in 1966 for the 1966-1967 secured assessment roll, involves personal property of an aggregate assessed value of $12,666,078. The property consists of imported metal-bearing ores and concentrates, such material in process, and refined metals, including gold, subject to United States Customs Bond, similar materials of foreign origin, including gold in petitioner's bonded warehouse, but not subject to bond, and gold of domestic origin. The assessment covers the inventories of such metals held on the first Monday of March 1966, and those which allegedly escaped assessment in the three preceding years. The total tax involved is $846,781.39.

The controversy embraced in the legal issues presented by this case antedates the founding of the present federal government.[2] It finds expression in the commerce clause[3] and the import-export clause[4] of the United States Constitution. The interpretations and application of the constitutional concepts are found in those precedents stemming from *Brown* v. *Maryland* (1827) 25 U.S. (Wheat.) 419 [6 L.Ed. 678].

The observations of Chief Justice Marshall, in *Brown* v. *Maryland, supra,* apply to the controversy presented by this case. There he wrote: "The constitutional prohibition on the states to lay a duty on imports—a prohibition which a vast

---

[1]The taxpayer alleged, the taxing authorities admitted, and the trial court found, that the trial court had jurisdiction to hear and determine the taxpayer's petition for writ of mandate. (See *Eisley* v. *Mohan* (1948) 31 Cal.2d 637, 640-642 [192 P.2d 5]; and cf. Cal. Const., art. XIII, § 15; and *Winters* v. *State Board of Equalization* (1949) 93 Cal.App.2d 87, 88-90 [208 P.2d 731].) This conclusion is buttressed by findings which set forth the alleged effect of the tax on the taxpayer's contractual relations with foreign producers of ore and concentrates, and which state the public importance of a prompt decision to the taxing entities involved.

[2]See Madison, Debates in the Federal Convention of 1787, August 28, 1787 (Hunt & Scott 1st ed.).

[3]Article I, section 8, clause 3 of the United States Constitution provides: "The Congress shall have Power . . . To regulate Commerce with Foreign Nations, and among the several States and with the Indian Tribes."

[4]Article I, section 10, clause 2 provides: ". . . No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Control of the Congress."

majority of them must feel an interest in preserving—may certainly come in conflict with their acknowledged power to tax persons and property within their territory. The power, and the restriction on it, though quite distinguishable, when they do not approach each other, may yet, when the intervening colors between white and black, approach so nearly as to perplex the understanding, as colors perplex the vision in marking the distinction between them. Yet the distinction exists, and must be marked as the cases arise.'' (25 U.S. at p. 441 [6 L.Ed. at p. 686].)

In this case immunity from taxation is predicated upon the following principles: First, that under the commerce clause, the Congress has explicitly, by approval of a Customs Regulation, prohibited the taxation of imported goods while under customs bond; Second, that even in the absence of the regulation, Congress by providing for bonded smelting and refining warehouses has preempted whatever rights the state or local government otherwise might have to tax imported ores and metals which are subject to bond; Third, that in any event the controverted assessment and tax would constitute a prohibited burden on foreign commerce. It is further asserted that the import-export clause precludes state and local taxation of the ores and minerals because they do not enter into domestic commerce until they are shipped from the smelter. Finally, the exemption of gold, whether of foreign or domestic origin, and whether unrefined and encompassed in ore, or in refined or pure state, is predicated upon federal laws and regulations governing the production, ownership and use of that precious metal.

The taxing authorities assail the ultimate findings of fact and the conclusions of law upon which the judgment is predicated. They insist that the taxpayer by engaging in the local business of smelting and refining, has subjected the property appropriated to that enterprise to local taxation, and that the regulations of the federal government which are designed to protect the collection of customs duties, and to restrict the market for gold do not endow such property with immunity from state or local taxation.

An examination of the uncontradicted facts in the light of the applicable principles of law leads to the conclusions that the ores and minerals in question, with the exception of those appropriated to fulfill the taxpayer's obligation to reexport, are not protected by the import-export clause, or the com-

merce clause; and that neither the federal laws and regulations enacted for the regulation of foreign commerce and the protection of the federal revenues, nor the laws and regulations restricting traffic in gold gives the ores and minerals an immunity from nondiscriminatory local taxation. The judgment must be reversed.

## General Facts

The following facts are extracted from the uncontroverted findings of fact made by the trial court.

The taxpayer is a corporation organized under the laws of New Jersey, with its principal office and place of business in New York. It is engaged in business in several states and in foreign countries. The present controversy arises out of its ownership of a lead smelter and refinery at Selby, in Contra Costa County, which it operates for the purpose of extracting refined lead and other metals from ores and concentrates. Most of the metal-bearing ores and concentrates smelted and refined by petitioner at Selby arrive by ocean-going transport from foreign countries. The ores and concentrates are unloaded directly onto the taxpayer's dock from the ship. Refined lead, refined gold, refined silver, minor amounts of refined platinum and palladium, and by-product materials containing copper, zinc, antimony, tin, bismuth and cadmium requiring further refining emerge from the smelter and refinery. The by-product materials are sent to refineries in other states for further refining. The refined metals extracted by Selby are not manufactured products but are unwrought metals sold to manufacturers for use as raw materials, except for those sales of gold bullion made to the United States government, and except for about 6 percent of the plant's total lead production which is produced in the form of antimonial lead, with antimony which is derived from the ores, concentrates and scrap lead processed in the smelter.

The taxpayer treats ores and concentrates under the terms and conditions of contracts negotiated with the owners of the material to be treated. Usually such a contract will provide that possession and risk of loss will pass to the taxpayer as "Buyer" at the time the property is delivered at the smelter. The taxpayer undertakes to pay the "Seller" for the raw material received on the basis of a stated percentage of the metal content at published market prices for those metals,

with specified deductions, called margins, for smelting and refining.[5]

In some cases the owner of the ores or concentrates desires to market some or all of the metals himself or is required to return those metals to the country of origin. In such cases a toll contract is negotiated stating the percentage of each metal content to be accounted for, the condition governing the return of metals, and the charges for smelting and refining. Under this type of contract the taxpayer returns to the supplier a quantity of metal equivalent to the accountable content of the ores delivered. The form of contract is essentially the same as that used in the case of ores over which the taxpayer has the unfettered power of disposition except that the return of an equivalent amount of metal is substituted for payment in cash.[6]

---

[5]The trial court further found: ''The form of contract by which petitioner acquires all the ores and concentrates it treats except those under toll contract [see text, *infra*] does not speak in terms of ownership but in terms of possession and risk of loss. . . . In economic effect, petitioner smelts and refines the ores and concentrates for the account of the foreign producer and accounts to him for the metals extracted therefrom, at the market price effective thirty days from receipt of the ores or concentrates.''

Any implication from the foregoing that the ores and concentrates and the metal extracted therefrom remain the property of the foreign producer until the taxpayer pays for the refined metal would not be consistent with the facts. The contract which the taxpayer appended to its petition for writ of mandate is clearly a contract of sale. The purchase price is predicated not upon the actual amount of refined metal produced, but upon the assay of the ore or concentrate. The buyer-refiner has protected itself by providing that the price fluctuations during the period the raw material would normally be in process will be a risk of the seller, by providing for an increase in deductions from the purchase price in the event of an increase in the average hourly wage at its plant, and by providing that taxes (see discussion, *infra*) shall be deducted from the purchase price. Nevertheless, the contract expressly recites: ''After sampling, the product [the ore or concentrate purchased] may be placed in process, commingled, or otherwise disposed of by BUYER.''

[6]The court further found with respect to these contracts: ''Pursuant to its toll contracts with foreign miners, petitioner's Selby smelter and refinery processes certain foreign ores which at all times belong to the foreign producer. The foreign producer mines and ships said ores, owns them while they are stored and then processed at Selby, and directs the ultimate disposition, i.e., whether import or export, of metals refined therefrom. At no time does petitioner own said ores or exercise control over them except at the direction of the foreign producer. However, refined metal is fungible and so is the particular foreign ore or concentrate after it reaches a certain stage in the smelting process. The Customs Regulations so recognize. For this reason, petitioner actually delivers an equivalent amount of refined metal to the foreign producer, not all of which may have come from his ore or concentrate.'' Of the total inven-

After their arrival at the taxpayer's plant, the ores and concentrates are segregated by producer and shipment, and are stored and assigned lot identification numbers in the taxpayer's yards. For technological reasons lots from each foreign mine must be enabled to enter the smelting and refining process as a separate unit because of the differing composition of different lots.

Throughout the years in question, and for over 40 years, the Selby refinery has been designated a Class 7 Customs Bonded Smelting and Refining Warehouse, and has continuously operated as such with the full approval of the United States Bureau of Customs. (See § 312 of the Tariff Act of 1930, as amended [19 U.S.C.A. § 1312].) Within its Selby bonded warehouse, the taxpayer smelts and refines imported metal-bearing materials upon which duties have not yet become payable and which are in the custody and under the supervision of the United States Bureau of Customs, together with imported metal-bearing materials which have been duty-paid, or which are duty-free. Domestic metal-bearing ores also enter the taxpayer's smelting processes. These domestic materials, which the taxpayer uses as fluxes, have a low metal content compared to the imported concentrates from which most of the silica and limestone naturally present in the ore has been removed by milling and concentrating processes at the foreign mines. The concentrating of ores permits the foreign miner to avoid shipping charges on relatively worthless rock and earth. Since the smelting process requires the use of limestone, silica and other fluxes, the taxpayer's Selby plant acquires these materials from domestic sources and in domestic fluxing ores of low-grade metal content. The taxpayer does

tories ($12,353,760) of property of foreign origin, the amount attributable to toll contracts ($131,869) is only slightly over one percent.

The court further found: "The percentages of the metal content of foreign ores and concentrates received at Selby that have been re-exported under the supervision of the Bureau of Customs in the years 1963-66 are as follows:

| Period | Gold | Silver | Lead | Copper |
|---|---|---|---|---|
| Year 1963 | 11.6% | 13.4% | .65% | None |
| Year 1964 | 14.7% | 20.0% | .70% | 7.2% |
| Year 1965 | 21.3% | 15.3% | .03% | 29.2% |
| First half of 1966 | 19.4% | 15.8% | None | 17.4%" |

The taxpayer now contends that there were imported metals (in excess of those embraced in toll contracts) which were committed to reexport on the lien dates involved. The record fails to show the amount involved on the respective lien dates or the basis for classifying the metals as committed to reexport.

not contest its assessment by Contra Costa County for property taxes on the metal content of ores of domestic origin, other than on domestic gold.

The taxpayer has been licensed by the United States Treasury Department, Office of Domestic Gold and Silver Operations to hold for treatment a maximum of ''400,000 fine troy ounces'' of gold. On the first Monday of March in 1966, and of each prior year, it was in possession of inventories of gold for treatment, in ores or in some stage of refining, or entirely refined and awaiting shipment. The taxpayer performs no manufacturing operation on gold, it only refines fine gold from gold-bearing materials.

On June 15, 1966, the county tax assessor notified petitioner that the 1966-1967 tax roll would reflect an assessment of $13,093,766 representing the aggregate of metal inventories of foreign origin on hand the first Monday in March 1966, and similar inventories which had escaped assessment for the tax years 1963-1964, 1964-1965 and 1965-1966. (See Rev. & Tax. Code, §§ 531-535. [The taxpayer raised objections to the application of the escaped assessment procedure before the board of supervisors, but did not carry them forward in its petition for a writ of mandate.]) The taxpayer made an application to the board of supervisors for a reduction of its assessment, a hearing was held and the application was denied. This litigation ensued. The trial court found that $12,353,760 of the proposed assessment represented property of foreign origin. Of this sum, $5,226,030 was unprocessed and the balance represented material in process and refined metal. Of the total sum of foreign origin, $8,970,009 represented property in bond, $4,779,403 unprocessed, and $4,190,606 in process and refined metal. Of the total property of foreign origin, $1,277,300 represented gold in ore, in process and refined. In addition, the court found that there was $292,318 in gold of domestic origin in varying stages of production. The total of the property of foreign origin, plus the value of the domestic gold, was relieved of the assessment and the tax.

*Import-Export Clause*

The court found as an ultimate finding of fact: ''Metals refined from metal-bearing materials imported at petitioner's Selby bonded smelting and refining warehouse do not enter the domestic commerce of the United States until after they leave the bonded warehouse enroute to a domestic

purchaser.'' Embodied in its conclusions of law is the statement, ''Pursuant . . . to the import clause of the United States Constitution (Art. I, § 10, cl. 2) . . . the Court will issue its writ of mandate. . . .'' The taxing authorities contend that the ultimate finding of fact is a mixed finding of fact and conclusion of law. The taxpayer asserts that it is a true finding of fact which is predicated upon other circumstances established by the evidence and set forth in the findings of fact. Analysis of this assertion indicates that it is predicated upon facts which tend to show that other federal laws and regulations have granted immunity to the property and so have withheld it from domestic commerce. This theory is discussed below in connection with the analysis of the question of federal preemption under the commerce clause. It is necessary to evaluate the immunity conferred by the import-export clause itself, not only to put the facts in proper perspective, but also because there is concededly some property, nondutiable or upon which the duty has been paid. Such property is on a different footing than that in which the federal government claims an interest in order to protect its revenue.

The fundamental test under the import-export clause was phrased by Chief Justice Marshall as follows: ''. . . when the importer has so acted upon the thing imported, that it has become incorporated and mixed up with the mass of property in the country, it has, perhaps, lost its distinctive character as an import, and has become subject to the taxing power of the state; . . .'' (*Brown* v. *Maryland, supra,* 25 U.S. at p. 441 [6 L.Ed. at p. 686].)

The taxing authorities claim that the producers and the sellers of the ores and concentrates are the importers because they bear the risk of loss until the property is delivered to the taxpayer's dock. They claim the right to tax which was recognized in *Waring* v. *The Mayor* (1868) 75 U.S. (8 Wall.) 110 [19 L.Ed. 342], wherein the court held that the resale, by one who had purchased from agents of the vessel for delivery into his lighters, was not protected because the shipowner and his agent were the importers. This contention is met by *Hooven & Allison Co.* v. *Evatt* (1945) 324 U.S. 652 [89 L.Ed. 1252, 65 S.Ct. 870], where the court distinguished that precedent, and on facts similar to those involved here, concluded: ''From all this it is clear that from the beginning, after the contract of purchase is signed, the foreign producer is obligated to sell

the merchandise on credit, to ship it to an American port and to deliver it to petitioner, which is obligated to accept and pay for it. Performance of the contract calls for, and necessarily results in, importation of the merchandise from its country of origin to the United States. Petitioner's contracts of purchase are the inducing and efficient cause of bringing the merchandise into the country, which is importation. Examination of the documents and consideration of the course of business can leave no doubt that the petitioner not only causes the importation but that the purpose and necessary consequence of it are to supply petitioner with the raw material for its manufacture of cordage at its factory in Ohio.'' (324 U.S. at p. 661 [89 L.Ed. at p. 1261].)

The taxing authorities also assert that the ores and concentrates and the resulting metals are not entitled to any immunity as imports because they are not packaged, but are handled in bulk. (See *E. J. Stanton & Sons* v. *County of Los Angeles* (1947) 78 Cal.App.2d 181, 187-189 [177 P.2d 804]; and *Mexican Petroleum Corp.* v. *City of South Portland* (1922) 121 Me. 128 [115 A. 900, 26 A.L.R. 965]; and cf. *Mexican Petroleum Corp.* v. *Louisiana Tax Com.* (1931) 173 La. 604 [138 So. 117].) The facts found tend to show a segregation which would justify the conclusion that the ores and concentrates prior to processing were retained in such ''original package'' as was consistent with their nature. It is unnecessary to resolve the question so presented, nor to determine whether the evidence, as distinguished from the facts found, shows such a commingling with domestic goods that the status of the ores and concentrates, the material in process, and the refined metals changed from imported material to part of the mass of property in the country. The salient issue is whether they were appropriated to the use for which they were imported.

In *Hooven & Allison Co.* v. *Evatt, supra,* the court stated: ''This Court has pointed out on several occasions that imports for manufacture cease to be such and lose their constitutional immunity from state taxation when they are subjected to the manufacture for which they were imported, *May* v. *New Orleans, supra,* 178 U.S. 501, 20 S.Ct. 977, 44 L.Ed. 1165; *Gulf Fisheries Co.* v. *MacInerney, supra,* 276 U.S. 126, 48 S.Ct. 228, 72 L.Ed. 495; *McGoldrick* v. *Gulf Oil Corp., supra,* 309 U.S. 423, 60 S.Ct. 667, 84 L.Ed. 840, or when the original packages in which they were imported are broken, *Low* v.

*Austin, supra,* 13 Wall. 34, 20 L.Ed. 517; *May* v. *New Orleans, supra,* 178 U.S. 508, 509, 20 S.Ct. 980, 981, 44 L.Ed. 1165. But no opinion of this Court has ever said or intimated that imports held by the importer in the original package and before they were subjected to the manufacture for which they were imported, are liable to state taxation." (324 U.S. at p. 666 [89 L.Ed. at p. 1264].) The court struck down an Ohio ad valorem tax assessed against bales of hemp and other fibres which the taxpayer was found to have imported and stored in a warehouse at its factory preliminary to their use in the manufacture of cordage and similar products. Four justices dissented.[7]

Of the cases cited in *Hooven & Allison Co.* v. *Evatt, supra, Gulf Fisheries Co.* v. *MacInerney* (1927) 276 U.S. 124 [72 L.Ed. 495, 48 S.Ct. 227]; and *McGoldrick* v. *Gulf Oil Corp.* (1939) 309 U.S. 414 [84 L.Ed. 840, 60 S.Ct. 664], are pertinent to the issues raised here. In the former case the court upheld a Texas license tax levied on a wholesale dealer in fish. The facts showed the fish were iced and processed on the wharf in Texas before being offered for sale. The court concluded,. "All the fish sold have, after landing and before laying the tax, been so acted upon as to become part of the common property of the State. They have lost their distinctive character as imports and have become taxable by the State." (276 U.S. at p. 127 [72 L.Ed. at p. 497].) From the foregoing it is clear that once the ores and concentrates are appropriated to the smelting and refining process for which they were imported they lose whatever immunity they might otherwise have had under the import-export clause. Any exemption for materials-in-process, or refined metals must be predicated upon other considerations.

*McGoldrick* v. *Gulf Oil Corp., supra,* does not contain anything to the contrary in regard to the claimed exemption under the import-export clause. The opinion recites: "For present purposes we may assume, without deciding, that had the crude oil not been imported in bond it would, upon its manufacture, have become a part of the common mass of property in the state and so would have lost its distinctive character as an import and its constitutional immunity as

---

[7]For a thorough review of the cited case, the prior decisions, and the fundamental principles involved by a distinguished teacher of constitutional law, see, Note, Professor Thomas Reed Powell, *State Taxation of Imports—When Does an Import Cease to be an Import?* (1945) 58 Harv. L.Rev. 858.

such from state taxation. See *Gulf Fisheries Co.* v. *MacInerney,* 276 U.S. 124, 126 [72 L.Ed. 495, 496, 48 S.Ct. 227]; *Waring* v. *The Mayor,* 8 Wall. 110 [19 L.Ed. 342]; *May* v. *New Orleans,* 178 U.S. 496 [44 L.Ed. 1165, 20 S.Ct. 976]; *New York* ex rel. *Burke* v. *Wells,* 208 U.S. 14 [52 L.Ed. 370, 28 S.Ct. 193]." (309 U.S. at p. 423 [84 L.Ed. at p. 845].) It concludes, "It is unnecessary to consider whether the tax upon the sale of the oil as ships' stores to vessels engaged in foreign commerce is in the circumstances of this case an impost on imports or exports, or a duty of tonnage prohibited by Article I, § 10, Clauses 2 and 3 of the Constitution." (*Id.,* at p. 429 [84 L.Ed. at p. 849].)

*Hooven & Allison Co.* v. *Evatt, supra,* appeared to give immunity to imported materials held for manufacture or processing. This immunity was limited, if not abolished, by the companion cases of *Youngstown Sheet & Tube Co.* v. *Bowers,* and *United States Plywood Corp.* v. *City of Algoma* (1958) 358 U.S. 534 [3 L.Ed.2d 490, 79 S.Ct. 383]. In these cases the court upheld property taxes on imported materials that were held for use in the manufacturing process.[8] It is

---

[8] "The facts in the *Youngstown* case are stipulated. In essence, they are that Youngstown, an Ohio corporation, operates an industrial plant in or near Youngstown, Ohio, where it manufactures iron and steel. In addition to the use of domestic ores, it imports iron ores from five countries 'for ultimate use in [its] open hearth [and] blast furnaces' in its manufacturing processes. The imported ores arrived in shiploads 'in bulk' either at an Atlantic or a Lake Erie port of entry where they are unloaded from the ship into railroad cars and are thereby transported to Youngstown's plant in Ohio. The plant is enclosed by a wire fence. Within the enclosure and 'adjacent to [the] manufacturing facilities' are several 'ore yards' for the storage of supplies of ore. Each ore yard consists of 'two parallel walls, on which there [is] a movable ore bridge.' When the imported ores arrive at this final destination, they are unloaded into one of the ore yards, but, because the ore from each country is different from the others and each is imported for a different use, the ores are kept segregated as to the country of origin by being 'placed in a separate pile in a separate area of the ore yard.' The daily manufacturing needs for ore are taken from these piles. As needed, ores are conveyed from the particular pile or piles selected to 'stock bins' or 'stock houses,' holding one or two days' supply and located in close proximity to the furnaces, from which the ores are fed into the furnaces. As ore from a particular 'pile' in the ore yard is thus taken and consumed, other like ore is similarly imported from the same country and is brought to the plant and unloaded on top of the remainder of that particular pile. This course is continuously repeated. Youngstown endeavors to maintain 'a supply of imported ores to meet its estimated requirements for a period of at least three months.' The ores are not imported 'for resale,' but 'for use in manufacturing [at the Ohio plant].' " (358 U.S. at pp. 536-537 [3 L.Ed.2d at pp. 493-494].)

"The facts in the *United States Plywood Corp.* case were found in

unnecessary to determine whether the majority opinion successfully distinguished *Hooven & Allison Co.* v. *Evatt.* (Cf. 358 U.S. at p. 544 [3 L.Ed.2d at p. 498] with Frankfurter, J. dissenting, at pp. 561-564 [3 L.Ed.2d at pp. 507-509], and see *The Supreme Court, 1958 Term* (1959) 73 Harv.L.Rev. 84, 176-179; Note (1959) 34 Notre Dame Law. 593, 594-596; and Note, 1959 Wis.L.Rev. 330, 335-336.) The majority concluded: "The materials here in question were imported to supply, and were essential to supply, the manufacturer's current operating needs. When, after all phases of their importation had ended, they were put to that use and indiscriminate portions of the whole were actually being used to supply daily operating needs, they stood in the same relation to the State as like piles of domestic materials at the same place that were kept for use and used in the same way. The one was then as fully subject to taxation as the other. In those circumstances, the tax was not on 'imports,' nor was it a tax on the materials because they had been imported, but because at the time of the assessment they were being used, in every practical sense, for the purposes for which they had been imported. They were therefore subject to taxation just like domestic property that was kept at the same place in the same way for the same use. We cannot impute to the Framers of the Constitution a purpose to make such a discrimination in favor of materials imported from other countries as would result if we approved the views pressed upon us by the manufacturers. Compare *May* v. *New Orleans,* 178 U.S. at 509 [44

detail by the trial court and those findings are not challenged here. In essence, they are that United States Plywood Corporation (petitioner) operates an industrial plant in Algoma, Wisconsin, where it manufactures veneered wood products. It uses both domestic and imported lumber and veneers in its manufacturing processes. The imported lumber is shipped in railroad cars directly from Canada to petitioner's plant. It is unfinished, and is received in bulk or as loose, individual pieces or boards. It is also 'green' when received and therefore must be dried before it can be used by petitioner. Upon arrival at destination, it is unloaded and carted to petitioner's storage yard, located 'adjacent' to its plant, where it is stacked in the open in such a way as to allow the air freely to circulate through the stacks for the 'dominant purpose' of air-drying it. This method does not so completely dry the lumber as to make kiln-drying unnecessary, but it does materially reduce the time and expense of that process. From time to time, so much of the lumber as is about to be put into veneered products is taken from the stacks and placed in a kiln where the drying is completed and the lumber readied for use. The veneers are imported from three countries. They are received in bundles and are kept in that form in piles, separated as to specie, in petitioner's plant for use as needed in the day-to-day operations of the plant." (*Id.,* pp. 538-539 [3 L.Ed.2d at pp. 494-495].)

L.Ed. at p. 1170].'' (*Id.*, pp. 549-550 [3 L.Ed.2d at pp. 500-501].)

From the foregoing there has been distilled a ''current operational needs'' test, to determine whether an inventory of materials of foreign origin may be subjected to taxation. (See *City & County of Denver* v. *Denver Publishing Co.* (1963) 153 Colo. 539, 548-549 [387 P.2d 48, 53]; *Orr Felt & Blanket Co.* v. *Schneider* (1965) 3 Ohio St.2d 14, 23-24 [209 N.E.2d 150, 156], followed in *Republic Steel* v. *Porterfield* (1968) 14 Ohio St.2d 101 [236 N.E.2d 661]; and *Wheeling Steel Corp.* v. *Porterfield* (1968) 14 Ohio St.2d 85 [236 N.E.2d 652]; Note, 34 Notre Dame Law., *supra,* 593, 596; and Note, *supra,* 1959 Wis.L.Rev. 330, 340.) In *Virtue Bros.* v. *County of Los Angeles* (1966) 239 Cal.App.2d 220 [48 Cal.Rptr. 505] (hearing by the S.Ct. denied, March 2, 1966, and writ of certiorari denied (1966) 385 U.S. 820 [17 L.Ed.2d 58, 87 S.Ct. 45]) the court, in a well reasoned opinion, rejected the formula, adopted by the Colorado and Ohio courts, which was predicated upon the amount of goods which would be used before the time needed to secure a new supply would elapse. (239 Cal.App.2d at pp. 228-229.) The court posed the rhetorical question, ''If all that a manufacturer requires for current operational needs is an inventory which will be expended just as the next regular shipment is unloaded at the manufacturer's plant, why is any inventory in excess of replenishment needs, so defined, ever maintained?'' (*Id.*, at pp. 229-230.) It concluded as follows: ''The materials here in question had reached the end of their importation journey, and indiscriminate portions of the whole were actually being used to supply daily operating needs. The property tax upon them was nondiscriminatory; they were not singled out because they were imported, nor was the tax even remotely connected with the activity of importation. Had the materials been of domestic origin, they would have been fully taxable under the assessment now in dispute. By enforcing this tax, California is in no way taking undue advantage of its position as an importing state to the detriment of inland states. 'We cannot impute to the Framers of the Constitution a purpose to make such a discrimination in favor of materials imported from other countries as would result if we approved the views pressed upon us by the manufacturers.' (*Youngstown Sheet & Tube Co.* v. *Bowers, supra,* at page 550 [3 L.Ed.2d at p. 501].) [Fn. omitted.] In our opinion, *Youngstown* requires

that the full inventory in the possession of plaintiffs, committed to the purpose of manufacture, on the first Monday in March, is subject to tax. We so hold.'' (*Id.*, at p. 231. See also, *South Coast Fisheries, Inc.* v. *Department of Fish & Game* (1963) 213 Cal.App.2d 325, 331-333 [28 Cal.Rptr. 537]; and cf. *Philippine Refining Corp.* v. *Contra Costa* (1938) 24 Cal.App.2d 665, 667-670 [76 P.2d 163]; and *Imperial Dev. Co.* v. *Calexico* (1920) 47 Cal.App. 666, 669-671 [191 P. 50].)

In this case it is established that all of the materials imported and held by the taxpayer were committed to the smelting and refining process from which the metals which gave the materials their value would be extracted.[8a] In the absence of some other countervailing factor the import-export clause confers no immunity on the materials held for further processing.

The taxpayer seeks to avoid this conclusion by distinguishing between manufacturing goods from imported raw materials, and the extraction of metals from raw ore or concentrates. The attempted distinction is one without a substantial difference. It is true that the goods produced by the manufacturing process generally have an intrinsic value distinguished from the value of the raw materials which went into their fabrication, whereas the metals extracted from the ores and concentrates are themselves raw materials, which previously gave value to the material from which they have been extracted. Any categorization of the taxability of the materials used in the various processes by the end results fails to correctly gauge where domestic commerce begins and importation leaves off. It is not merely the sale of the end product that constitutes the domestic commerce. It is the carrying on of the business of manufacturing, processing or extracting which is the subject of local jurisdiction. (See *Adams Mfg. Co.* v. *Storen* (1938) 304 U.S. 307, 312-314, and cases cited fns. 14 & 15 [82 L.Ed. 1365, 1369-1371, 58 S.Ct. 913, 117 A.L.R. 429].) The conclusions in this regard make it unnecessary to consider to what extent the taxpayer produces lead products, as distinguished from refined metals.

---

[8a] The taxpayer offered to prove, on the basis of testimony that 4,200 tons of ore-bearing material on hand would be necessary to keep the plant in constant operation on a 12-day processing schedule, that all foreign crude stock over that amount was held in excess of current operational needs. The trial court correctly applied *Virtue Bros.* v. *County of Los Angeles* (1966) 239 Cal.App.2d 220 [48 Cal.Rptr. 505] to exclude this evidence.

There remains for consideration the small amount of ores and refined metals attributable to toll contracts which the court found were included in the inventories. The findings are inconsistent (see fn. 6, and accompanying text, *supra*). On the one hand, it is stated that the foreign producer under such contracts owns the ores in storage, the material in process and the refined metal. On the other hand, the contracts are said to be similar to the general contracts, with the exception that payment is made in specie rather than money. It is acknowledged that no particular refined metal is appropriated to the satisfaction of the obligation incurred by the contracts.

Goods in transit for export are immune from state and local taxation. (See cases reviewed in *Von Hamm-Young Co.* v. *City & County of San Francisco* (1947) 29 Cal.2d 798, 802 [178 P.2d 745, 171 A.L.R. 274] ; *Export Leaf Tobacco Co.* v. *County of Los Angeles* (1949) 89 Cal.App.2d 909, 916-922 [202 P.2d 622] ; and Note, *Import-Export Clause: A Blanket Prohibition Misapplied,* 40 So.Cal.L.Rev. 529.) On the other hand, where the transit is halted to process the goods, or otherwise, for the business purposes and profit of the person entitled to the goods, the property may be subject to tax. (*Bacon* v. *Illinois* (1913) 227 U.S. 504, 515-517 [57 L.Ed. 615, 620-621, 33 S.Ct. 299] ; and see *Von Hamm-Young Co.* v. *City & County of San Francisco, supra,* 29 Cal.2d at p. 803 ; and *Export Leaf Tobacco Co.* v. *County of Los Angeles, supra,* 89 Cal.App.2d at p. 923.) Under the foregoing principles there was such a break in the transit of the ore from the owner-producer, and the return of the refined metal to it, as to subject the ore awaiting process and in process to taxation, unless prevented by intervening federal law.

Although it might be said that certain metal refined from the particular ore was appropriated for export, the facts do not show that there was such an appropriation. From all that appears the taxpayer was free to satisfy his obligation to the ''owner'' by sending refined metal from Selby, or an equivalent amount purchased domestically or anywhere else in the world. Under these circumstances, there is no particular refined metal which can claim the protection of the export portion of the import-export clause. (*Hugo Neu Corp.* v. *County of Los Angeles* (1966) 241 Cal.App.2d 703, 707-709 [50 Cal.Rptr. 916] ; and cf. *Montrose Chemical Corp.* v.

*County of Los Angeles* (1966) 243 Cal.App.2d 300, 303-304 [52 Cal.Rptr. 209].)

In *Youngstown Sheet & Tube Co.* v. *Bowers, supra,* the court stated: ''The design of the constitutional immunity was to prevent '[t]he great importing States [from laying] a tax on the non-importing States,' to which the imported property is or might ultimately be destined, which would not only discriminate against them but also 'would necessarily produce countervailing measures on the part of those States whose situation was less favorable to importation.' (*Brown* v. *Maryland, supra,* at 440 [6 L.Ed. at p. 686]. [Other citations omitted.]'' (358 U.S. at p. 545 [3 L.Ed.2d at p. 498].) The taxpayer points out that the Selby refinery's tidewater location is a vital factor because it enables it to secure foreign ores. It contends that to permit the tax would offend the quoted principle because the taxing authorities would be levying a toll on inland states where any of the refined metals are ultimately sold and used. This argument overlooks the qualifying phrase ''so long as they retain their distinctive character as imports.'' This character is lost when the transit is interrupted for processing, whether it be at the Selby plant, in Nevada, in Youngstown, Ohio, or in Algoma, Wisconsin. The significance of the tideland location is that it permits the refiner to reduce the costs of production by dispensing with the expense of transporting bulk ore overland; and, assuming a free market, results in a reduction of the price to the consumer. Presumably the refinery would be equally responsible for the costs of local government (and thereby pass on burdens to the ultimate consumer) if it conducted its refining of imported ores in any of the aforementioned locations.

No independent ground of tax immunity is found under the import-export clause.

### Commerce Clause

■ The court found as an ultimate finding of fact, ''The assessed taxes would constitute a serious economic burden on foreign commerce.'' It concluded in part, ''Pursuant . . . to the commerce clause of the United States Constitution (Art. I, § 8, cl. 3) . . . the Court will issue its writ of mandate.''

In *Brown* v. *Maryland, supra,* Chief Justice Marshall reviewed '' [t]he oppressed and degraded state of commerce, previous to the adoption of the constitution. . . .'' (25 U.S. at p. 445 [6 L.Ed. at p. 688].) He examined ''the just extent

of a power to regulate commerce with foreign nations, and among the several states." (*Id.*, p. 446 [6 L.Ed. at p. 688].) He concluded: "Congress has a right not only to authorize importation, but to authorize the importer to sell. . . ." (*Id.*, p. 446 [6 L.Ed. at p. 688].) ". . . if the power to authorize a sale, exists in Congress, the conclusion that the right to sell is connected with the law permitting importation, as an inseparable incident, is inevitable. . . . Any charge on the introduction and incorporation of the articles into and with the mass of property in the country, must be hostile to the power given to Congress to regulate commerce, since an essential part of the regulation, and principal object of it, is, to prescribe the regular means for accomplishing that introduction and incorporation . . . the taxing power of the states . . . cannot interfere with any regulation of commerce." (*Id.*, p. 447 [6 L.Ed. at p. 688].)

The distinction between the restraint on state power imposed by the commerce clause, and the prohibitions of the import-export clause are set forth in *Richfield Oil Corp.* v. *State Board* (1946) 329 U.S. 69 [91 L.Ed. 80, 67 S.Ct. 156]. "The two constitutional provisions, while related, are not coterminous. To be sure, a state tax has at times been held unconstitutional both under the Import-Export Clause and under the Commerce Clause. *Brown* v. *Maryland*, 12 Wheat. 419 [6 L.Ed. 678]; *Crew Levick Co.* v. *Pennsylvania*, 245 U.S. 292 [62 L.Ed. 295, 38 S.Ct. 126]. But there are important differences between the two. The invalidity of one derives from the prohibition of taxation on the import or export; the validity of the other turns nowise on whether the article was, or had ever been, an import or export. See *Hooven & Allison Co.* v. *Evatt*, 324 U.S. 652, 665-666 [89 L.Ed. 1252, 1263-1264, 65 S.Ct. 870], and cases cited. Moreover, the Commerce Clause is cast, not in terms of a prohibition against taxes, but in terms of a power on the part of Congress to regulate commerce. It is well established that the Commerce Clause is a limitation upon the power of the States, even in absence of action by Congress. *Southern Pac. Co.* v. *Arizona*, 325 U.S. 761 [89 L.Ed. 1915, 65 S.Ct. 1515]; *Morgan* v. *Virginia*, 328 U.S. 373 [90 L.Ed. 1317, 66 S.Ct. 1050, 165 A.L.R. 574]. But the scope of the limitation has been determined by the Court in an effort to maintain an area of trade free from state interference and at the same time to make interstate commerce

pay its way. ▇ As recently stated in *McGoldrick* v. *Berwind-White Coal Mining Co., supra,* p. 48 [309 U.S. 33 (84 L.Ed. 565, 571, 60 S.Ct. 388, 128 A.L.R. 876)], the law under the Commerce Clause has been fashioned by the Court in an effort 'to reconcile competing constitutional demands, that commerce between the states shall not be unduly impeded by state action, and that the power to lay taxes for the support of state government shall not be unduly curtailed.' That accommodation has been made by upholding taxes designed to make interstate commerce bear a fair share of the cost of the local government from which it receives benefits (see e.g. *Western Live Stock* v. *Bureau of Revenue,* 303 U.S. 250, 254-55 [82 L.Ed. 823, 826-827, 58 S.Ct. 546, 115 A.L.R. 944], and cases cited; *McGoldrick* v. *Berwind-White Coal Mining Co., supra*) and by invalidating those which discriminate against interstate commerce, which impose a levy for the privilege of doing it, which place an undue burden on it. *Adams Mfg. Co.* v. *Storen,* 304 U.S. 307 [82 L.Ed. 1365, 58 S.Ct. 913, 117 A.L.R. 429]; *Gwin, White & Prince, Inc.* v. *Henneford,* 305 U.S. 434 [83 L.Ed. 272, 59 S.Ct. 325]; *Best & Co.* v. *Maxwell,* 311 U.S. 454 [85 L.Ed. 275, 61 S.Ct. 334]; *Nippert* v. *Richmond,* 327 U.S. 416 [90 L.Ed. 760, 66 S.Ct. 586, 162 A.L.R. 844].

"It seems clear that we cannot write any such qualifications into the Import-Export Clause. It prohibits every State from laying 'any' tax on imports or exports without the consent of Congress. Only one exception is created—'except what may be absolutely necessary for executing its inspection laws.' The fact of a single exception suggests that no other qualification of the absolute prohibition was intended. It would entail a substantial revision of the Import-Export Clause to substitute for the prohibition against 'any' tax a prohibition against 'any discriminatory' tax. As we shall see, the question as to what is exportation is somewhat entwined with the question as to what is interstate commerce. But the two clauses, though complementary, serve different ends. And the limitations of one cannot be read into the other." (329 U.S. at pp. 75-76 [91 L.Ed. at pp. 88-89].)

The taxpayer acknowledges that before a state tax or regulation can be declared unconstitutional under the commerce clause, it must be shown to "burden" the commerce involved, be it interstate or foreign (see *Halliburton Oil Well etc. Co.* v. *Reily* (1963) 373 U.S. 64, 69 [10 L.Ed.2d 202, 206,

83 S.Ct. 1201]; *Nippert* v. *City of Richmond* (1946) 327 U.S. 416, 425 [90 L.Ed. 760, 765, 66 S.Ct. 586, 162 A.L.R. 844]; *Gwin etc. Inc.* v. *Henneford* (1939) 305 U.S. 434, 438 [83 L.Ed. 272, 275-276, 59 S.Ct. 325]; *Adams Mfg. Co.* v. *Storen* (1937) 304 U.S. 307, 312 [82 L.Ed. 1365, 1370, 58 S.Ct. 913, 117 A.L.R. 429]; *Anglo-Chilean etc. Corp.* v. *Alabama* (1933) 288 U.S. 218, 225 and 228 [77 L.Ed. 710, 714, 716, 53 S.Ct. 373]); and that it is not every "burden" that falls under the restraint which is implied from the grant of power to the federal government. As noted in the last quotation, the test is usually discrimination.

The most obvious form of discrimination is a tax or regulation which directly singles out a subject which is solely related to the protected activity. (See *Spector Motor Service* v. *O'Connor* (1951) 340 U.S. 602, 607-610 [95 L.Ed. 573, 577-579, 71 S.Ct. 508]; *Anglo-Chilean etc. Corp.* v. *Alabama, supra,* 288 U.S. 218, 229 [77 L.Ed. 710, 716]; *DiSanto* v. *Pennsylvania, supra,* 273 U.S. 34, 37 [71 L.Ed. 524, 526-527, 47 S.Ct. 267]; *Texas Transp. Co.* v. *New Orleans* (1924) 264 U.S. 150, 152-153 [68 L.Ed. 611, 612-613, 44 S.Ct. 242, 34 A.L.R. 907]; *Bowman* v. *Chicago etc. Ry. Co.* (1888) 125 U.S. 465, 493 [31 L.Ed. 700, 710, 8 S.Ct. 689]; and *Henderson* v. *Mayor* (1875) 92 U.S. 259, 274 [23 L.Ed. 543, 550].) The general property tax involved in this case in no sense singles out property which is the subject of foreign or interstate commerce. The tax is designed to tax all property found within the taxing district or districts, except that which is expressly exempt. (Cal. Const., art. XIII, § 1; Rev. & Tax. Code, § 201.) Moreover, the principles discussed above demonstrate that the property, which the taxing authorities have assessed and seek to tax (with the possible exception of that which is the subject of toll contracts), has left the stream of foreign and interstate commerce, and has become a part of the general mass of property within the state, subject to use, processing and future sale by the domestic smelter and refinery. (See *Youngstown Sheet & Tube Co.* v. *Bowers & United States Plywood Corp.* v. *City of Algoma, supra,* 258 U.S. 534; *Gulf Fisheries Co.* v. *MacInerney, supra,* 276 U.S. 124; *Virtue Bros.* v. *County of Los Angeles, supra,* 239 Cal.App.2d 220; and cf. *McGoldrick* v. *Gulf Oil Corp., supra,* 309 U.S. 423, 429 [84 L.Ed. 840, 848-849].) Similar principles have been applied to defeat claims that local taxes burdened interstate

commerce. (See *Gregg Dyeing Co.* v. *Query* (1931) 286 U.S. 472, 478-479 [76 L.Ed. 1232, 1237-1238, 52 S.Ct. 631, 84 A.L.R. 831]; *Bacon* v. *Illinois, supra,* 227 U.S. 504, 515-517 [57 L.Ed. 615, 620-621]; *General Oil Co.* v. *Crain* (1908) 209 U.S. 211 [52 L.Ed. 754, 28 S.Ct. 475]; and *American Steel & Wire Co.* v. *Speed* (1904) 192 U.S. 500 [48 L.Ed. 538, 24 S.Ct. 365].)[9]

. Discrimination may also occur because the effect of a tax or regulation, nondiscriminatory on its face, is such as to place an actual recognizable burden on foreign or interstate commerce. Such a situation occurs when the protected business is forced to bear a heavier tax burden than domestic business (see *Halliburton Oil Well etc. Co.* v. *Reily, supra,* 373 U.S. 64, 69-70 [10 L.Ed.2d 202, 206-207]; *Nippert* v. *City of Richmond, supra,* 327 U.S. 416, 423, 433-435 [90 L.Ed. 760, 769-771]); or when a domestic tax, otherwise sustainable as not directly burdening the protected commerce, subjects that commerce to multiple taxation which results in a discrimination in favor of domestic business (see *Gwin etc. Inc.* v. *Henneford, supra,* 305 U.S. 434, 438-439 [83 L.Ed. 272, 275-276]; *Adams Mfg. Co.* v. *Storen, supra,* 304 U.S. 307, 311-314 [82 L.Ed. 1365, 1369-1371]).

The taxpayer does not claim that the question posed by this case falls within any of the foregoing precedents. It does insist that ''a concern with the actuality of operation'' of the tax (see *Halliburton Oil Well etc. Co.* v. *Reily, supra,* 373 U.S. at p. 69 [10 L.Ed.2d at p. 206]) reveals that the imposition of the tax demonstrably and arbitrarily burdens both the taxpayer and the foreign producers whose ores respondent processes. The taxpayer alleged, and the court has found, facts concerning the economics of the taxpayer's operation which it contends support that conclusion. On analysis it

[9]Chief Justice Marshall's supposition that goods in interstate commerce would enjoy the same protection afforded imports (*Brown* v. *Maryland, supra,* 25 U.S. at p. 449 [6 L.Ed. at p. 689]) was not realized. (Cf. *Woodruff* v. *Parham* (1868) 75 U.S. 123, 139 [19 L.Ed. 382, 387]; and see Note, Powell (1945) *State Taxation of Imports: When Does An Import Cease to Be an Import?* 58 Harv.L.Rev. 858, 868-870.) It, therefore, appears that goods originating in a foreign country, after they have come to rest within a state, may enjoy a protection under the import-export clause which is denied goods originating in a sister state under the commerce clause, after they have come to rest within the state of destination. This conclusion does not, however, indicate that the commerce clause, itself, furnishes greater protection to goods in foreign commerce than it does to goods in interstate commerce.

appears that although the proposed tax will certainly burden the taxpayer's operations, it is in no sense arbitrary or discriminatory. Any economic hardship[10] should not be relieved by a subsidy from those otherwise forced to contribute more to the costs of local government, or, alternatively, those who are deprived of the services of local government which the taxes would produce. The facts and the arguments predicated thereon are more appropriate for an appeal to Congress for a subsidy or for legislation which will impose or increase duties on the refined metals that the taxpayer produces so that it can compete in a world market. If the national interest requires a subsidy it should be borne by the nation as a whole. If duties are increased, the ultimate consumers could pay for the increased cost of domestic production. There is no reason why the taxpayer should be subsidized locally through the claimed exemption.

The facts bearing on the taxpayer's contentions are as follows: The Selby plant is the only lead smelter and refinery located at tidewater in the Western Hemisphere. In the years 1963, 1964 and 1965 it refined quantities of gold of domestic and foreign origin, newly mined silver, and primary lead and antimonial lead which constituted a substantial (10 percent— 13.9 percent) percentage of domestic, and in the case of silver, world, production. The taxpayer competes in a world market for the ores and concentrates which it smelts and refines. Its competitors are in Japan and other foreign countries.[11] To be competitive it has had to reduce the smelting and refining

---

[10]The findings of fact do not indicate the net profit which the taxpayer derives from its Selby operations. It may be assumed for argument, without factual basis, that the imposition of the tax would warrant an increase in prices (if the market would bear it, and if it is not prohibited by law, as with gold) to insure a fair profit, or conversely that the payment of the tax would render the refinery a marginal or a losing operation.

[11]The court additionally found: ''Its tidewater location enables petitioner's Selby smelter and refinery to compete with lead smelters in Europe and Japan for the custom smelting required by Foreign producers of ores and concentrates. Only the largest foreign mine operators can afford to construct the technologically complex and expensive smelting and refining facilities for themselves. Most of the foreign ores and concentrates treated at Selby come from Peru, Bolivia and Australia. Ores from these sources can as readily move to lead smelters in Japan, Europe or Canada as to Selby. Severe competition for Selby may come from any of those foreign smelters in the case of any specific contract negotiation, depending upon the particular matellurgical quality of an ore, market conditions and the condition of a smelter's ore supply. For

margins charged foreign producers to the minimum.[12] The disputed tax on foreign ores, concentrates and metals on hand in March 1966 was $220,801.94 and is not likely to be less in future years. The court found the average property tax charge per ton and the average smelting and refining charge per ton.[13] It found that an attempt to pass on these charges to the supplying producers would result in the taxpayer's losing its business to foreign smelters, and that the imposition of the tax would materially reduce the Selby smelter's international competitive position.[14]

The taxpayer's contracts with foreign producers contain a provision that all governmental charges, except income taxes, are to be borne by the producer through a deduction from the computed purchase price.[15] The court made extensive findings

some years many of the foreign custom smelters, especially the Japanese, have been increasing the quantities they have acquired or attempted to acquire from Peru, Bolivia and Australia. Through price supports, the Japanese government subsidizes customs smelters located in Japan.''

[12]The court specifically found: ''To meet competition from foreign custom smelters over recent years petitioner has made concessions in its smelting and refining charges. Its 1966 contracts with foreign mine operators provided for smelting and refining charges averaging about $5.00 per ton less than those specified in the 1961 contracts (after adjustment for increased wage rates).''

[13]These figures are:

|  | ''Average Property Tax Charge Per Ton | Average Smelting & Refining Charge Per Ton |
|---|---|---|
| On first Monday in March 1966 | $ 9.86 | $116.90 |
| On first Monday in March 1963 | 4.49 | 107.33 |
| On first Monday in March 1964 | 5.65 | 111.77 |
| On first Monday in March 1965 | 11.62 | 106.47'' |

[14]These findings read: ''For petitioner to pass on to its ore suppliers a property tax of $5.00 per ton or more would result in its loss of many and possibly all ores from those suppliers to foreign custom smelters.

''. . . Petitioner passes on to its foreign suppliers the United States import duty on lead. The effect of the duty under normal conditions is to produce a higher price for lead in the United States than prevails in the world market. Accordingly, the foreign producer can afford to pay this duty out of the higher price when petitioner charges the duty to the supplier. The imposition of a property tax by Contra Costa County will not increase United States lead prices as does the customs duty which is uniform throughout the United States.

''. . . Its tidewater location with ease of access to ocean shipping gives the Selby plant a competitive advantage over plants not so located since unloading and reloading charges and rail freight are eliminated. The property tax the County of Contra Costa seeks to impose will materially reduce the international competitive advantage of a seacoast location.''

[15]This clause reads: ''Taxes: All taxes or other governmental charges, national, local or municipal, now or hereafter imposed in respect to or

concerning the consequences which would result from the enforcement of this clause if the tax were upheld.[16]

The taxpayer asserts that the burden on foreign commerce is clear and direct because the imposition of the tax would result in a direct charge on the foreign producer when the price he receives is reduced by the amount of the tax. It is obvious that this result would be occasioned not by the levy and collection of the tax of itself, but because of the contractual relationship of the parties.

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits cannot be doubted. [Citations.]" (*Gregory* v. *Helvering* (1935) 293 U.S. 465, 469 [79 L.Ed. 596, 599, 55 S.Ct. 266, 79 A.L.R. 1355]; and see *United States* v. *Isham* (1873) 84 U.S. (17 Wall.) 496, 506 [21 L.Ed. 728, 731].) Nevertheless the tax in this case, as has been demonstrated, is on the property held in this state for process-

measured by the product purchased hereunder, or the production, extraction, smelting, refining, sale, transportation, exportation, proceeds or value thereof, or of the metals derived therefrom, other than income taxes levied upon the BUYER, shall be for the account of the SELLER and shall be deducted from the purchase price payable hereunder.''

[16]These findings read: ''. . . All of petitioner's contracts with foreign producers contain provisions that all governmental levies, except income taxes, are to be borne by the foreign producer. If petitioner is to enforce this provision it must, for practical reasons, do so currently, i.e., when remitting net balances to the foreign producer. Once the net balances have been paid over, petitioner would have great expense and doubtful results in suing in foreign courts to recover the tax reimbursement.

''. . . Possibly only the foreign producers whose ores are present on tax day are liable to reimburse petitioner, and so the practice could develop, if petitioner must pay the tax and seek reimbursement, whereby foreign producers would simply refuse to ship ores at that time. Since petitioner's Selby plant is predominantly a refiner of foreign ores, this could effectively put it out of operation for a month or so each year. Thus having to pay the tax as a condition to disputing it could do petitioner irreparable harm.

''Petitioner probably could not compete effectively with its foreign competitors if it should become known that foreign producers with ore or metals present at Selby on tax day would be burdened with the property tax. They would simply send their ores to the foreign competition, which would do petitioner permanent and irreparable harm because petitioner relies for its business in important part on its financial and technical ability to take all the lead ore a producer sends it and it cannot afford to have the foreign producers become accustomed to sending ore elsewhere.

''The taxes asserted by respondents would under these contracts become an economic burden on those foreign producers who happen to have ores or metals present at Selby on the first Monday in March. Other foreign producers not having ores or metals present at Selby on the first Monday in March would suffer no such burden.''

ing, property in process, and property processed. The validity of the tax depends upon the legal conclusion, from the facts, that the property is no longer an import, nor is it in the stream of interstate commerce. The taxing authorities, therefore, are not concerned with the arrangements made between the buyer and seller governing the price to be paid for the goods, even though that contract purports to shift the incidence of the tax.

In *Browning* v. *Waycross* (1914) 233 U.S. 16 [58 L.Ed. 828, 34 S.Ct. 578], the court upheld an occupation tax upon agents or dealers engaged in putting up lightning rods within the city. The court stated, "We are of the opinion that the court below was right in holding that the business of erecting lightning rods under the circumstances disclosed, was within the regulating power of the state and not the subject of interstate commerce for the following reasons: (a) Because of the affixing of lightning rods to houses, was the carrying on of a business of a strictly local character, peculiarly within the exclusive control of state authority. (b) Because, besides, such business was wholly separate from interstate commerce, involved no question of the delivery of property shipped in interstate commerce or of the right to complete an interstate commerce transaction, but concerned merely the doing of a local act after interstate commerce had completely terminated. It is true, that it was shown that the contract under which the rods were shipped bound the seller, at his own expense, to attach the rods to the houses of the persons who ordered rods, but *it was not within the power of the parties by the form of their contract to convert what was exclusively a local business, subject to state control, into an interstate commerce business protected by the commerce clause.* It is manifest that if the right here asserted were recognized, or the power to accomplish by contract what is here claimed were to be upheld, all lines of demarcation between national and state authority would become obliterated, since it would necessarily follow that every kind or form of material shipped from one state to the other, and intended to be used after delivery in the construction of buildings or in the making of improvements in any form, would or could be made interstate commerce." (233 U.S. at pp. 22-23 [58 L.Ed. at pp. 832-833]; italics added; see also *Superior Oil Co.* v. *Mississippi* (1930) 280 U.S. 390, 394-396 [74 L.Ed. 504, 507-508, 50 S.Ct. 169].) So here, the parties, by their arrangements for the price, cannot

relieve the property in local commerce of its liability to contribute a fair share to the local government which serves that commerce.

The taxpayer contends that an unequal, discriminatory burden is imposed because the tax, which is predicated upon the property on hand on the first Monday in March, will fall only on those producers whose ores and concentrates and metals are on hand at Selby on tax day, and that those whose shipments have been received, processed and sold between annual assessment days will escape the tax.[17] This overlooks the fact that all the ores and concentrates are purchased by the taxpayer, and are not the property of the producers. Any eccentricity in the purchase price received by the producers for various shipments would be occasioned by the contract, not the administration of the taxing system. As noted above, the parties by contract cannot deprive the local government of its power to tax local commerce.

Along the same line, the taxpayer insists that the imposition of the tax will cause foreign producers to ship elsewhere or withhold shipments if it appears that their shipment will arrive at Selby on or just prior to the lien date. (See Rev. & Tax. Code, §§ 117, 405 and 2192.) One answer to this contention is that under any contract similar to that attached to the complaint, the producer is already bound to deliver his production and pay the tax. Secondly, the consequence again is attributable to the contract, not the tax.

The taxpayer also demonstrates, and it is obvious, that if it does not pass the tax on to the producers, its competitive situation in bidding for foreign ores and concentrates is weakened to the extent of the tax. The same result follows if its labor costs, or insurance rates, or fuel and power costs increase. If the national interest necessitates a constant flow of refined metals, particularly lead,[18] through Selby at costs which the domestic price for the refined metals cannot meet, the national treasury and not the local taxing entities, should

---

[17]Compare the average inventory method as referred to in section 5711.16 of the Revised Code of Ohio as set out in concurring opinion of Taft, C. J., in *Wheeling Steel Corp.* v. *Porterfield* (1968) 14 Ohio St.2d 85, 100 [236 N.E.2d 652, 661].

[18]The taxpayer states: ''The United States to meet its war needs has either eliminated import quotas or reduced or suspended its own duties on the very metals Contra Costa County is attempting to tax (19 U.S.C.A., § 1202).''

bear the cost of necessary subsidization as the government of Japan allegedly is doing for its smelters and refineries.

The taxpayer relies upon the principle that the commerce clause should be interpreted to prohibit the tax in order to prevent a tidewater state from burdening users and consumers in the interior states. (See *Cook* v. *Pennsylvania* (1878) 97 U.S. 566, 574-575 [24 L.Ed. 1015, 1018].) It was noted in connection with the import-export clause that this policy is inapplicable where processing occurs in the tidewater state. The same considerations compel rejection of the application of the prohibitions of the commerce clause.

Finally, the taxing authorities are accused of attempting to share and interfere with the federal government's power to impose duties on imports, and regulate the flow of commerce according to its wishes by the exercise of this power. The opposite side of the coin reveals that the taxpayer seeks a subsidy under the cloak of a constitutional exemption which does not exist. The crucial factor is that the protected commerce has been interrupted so that the taxpayer may process the goods to his profit. The burdens imposed by the local government for the services rendered the processor do not violate the unembellished provisions of the commerce clause.

### Federal Preemption

In this case approximately three-quarters of the value ($8,970,009 out of $12,353,760) of materials of foreign origin which were assessed were subject to United States Custom Bond. The taxpayer claims that the applicable legislation, and the regulations which have permitted it to establish its premises as a bonded smelting and refining warehouse preempt any right that the local government otherwise might have to levy nondiscriminatory property taxes on the property of foreign origin which is locally processed by the taxpayer.

The ultimate findings of fact recite: ''Throughout the years 1963 through 1966, petitioner's Selby plant was designated and operated as a Class 7 Customs Bonded Warehouse under the laws of the United States with the complete approval of the United States Bureau of Customs.

''. . . Throughout the years 1963 through 1966, the United States Bureau of Customs supervised the smelting and refining of imported materials containing dutiable metals in petitioner's bonded warehouse at Selby; while inside the bonded warehouse, the imported metal-bearing materials remained in the custody of the United States Bureau of Customs.''

The court concluded: "The Tariff Act of 1930, as amended, constitutes congressional regulation of foreign commerce which prohibits state or local government taxation of imported goods in petitioner's Customs Bonded Warehouse.

"Pursuant to the foregoing preemptive federal regulation . . . to the supremacy clause of the United States Constitution (Art. VI, cl. 2)[19] . . . and to decisions of the Supreme Court of the United States (*McGoldrick* v. *Gulf Oil Corp.* (1940) 309 U.S. 414, 60 S.Ct. 664; *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.* (1964) 377 U.S. 324, 84 S.Ct. 1293), The Court will issue its writ of mandate . . ."

In *Board of Trustees* v. *United States* (1933) 289 U.S. 48 [77 L.Ed. 1025, 53 S.Ct. 509], the court pointed out that the Tariff Act in question was an exercise of the congressional authority "to regulate commerce with foreign Nations." (U.S. Const., art. I, § 8, cl. 3.) The court stated: "The words of the Constitution 'comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend.' *Gibbons* v. *Ogden*, 9 Wheat. 1, 193 [6 L.Ed. 23, 69]. It is an essential attribute of the power that it is exclusive and plenary. As an exclusive power, its exercise may not be limited, qualified or impeded to any extent by state action. *Id.* pp. 196-200 [6 L.Ed. at pp. 70-71]; *Brown* v. *Maryland*, 12 Wheat. 419, 446 [6 L.Ed. 678, 688]; *Almy* v. *California*, 24 How. 169, 173 [16 L.Ed. 644, 646]; *Buttfield* v. *Stranahan*, 192 U.S. 470, 492, 493 [48 L.Ed. 525, 534, 535, 24 S.Ct. 349]. The power is buttressed by the express provision of the Constitution denying to the States authority to lay imposts or duties on imports or exports without the consent of the Congress. Art. I, § 10, ¶ 2.

"The Congress may determine what articles may be imported into this country and the terms upon which importation is permitted." (289 U.S. at pp. 56-57 [77 L.Ed. at p. 1028].)

Section 312 of the Tariff Act of 1930 as amended (June 17, 1930, ch. 497, tit. III, § 312; 46 Stat. 692; May 24, 1962, Pub.

---

[19]Article VI, clause 2 provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

L. 87-456, tit. III, § 301(b) ; 76 Stat. 75 ; 19 U.S.C.A., § 1312) provides for the establishment of a bonded smelting or refining warehouse.[20] The provisions for cancellation of charges against the bond recognize the fungible nature of the refined metal. They refer to ''a quantity of the same kind of metal contained in any product of smelting or refining of metal-bearing materials equal to the dutiable quantity contained in the imported metal-bearing materials less wastage . . .'' (§ 312, subd. (b), pars. (1), (3), (4) and (5).) The bond is discharged to the extent such quantity is exported, or transferred to another bonded smelting or refining warehouse, or transferred to another bonded custom warehouse, or to the extent the bond charges for the duties may be transferred to another bonded smelter or refining warehouse where ''there is on hand at the warehouse . . . sufficient like metal in any form to satisfy the transferred bond charges.'' (*Id.*) Charges against the bond may of course be discharged ''upon payment of duties on the dutiable quantity of metal contained in the imported metal-bearing materials.'' (§ 312, subd. (b), par. (2).)

Similar provisions have existed since 1894. (See Historical Note, 19 U.S.C.A., § 1312 at p. 46.) *In re Guggenheim Smelting Co.* (3d Cir. 1903) 126 F. 728, involved a question of the construction of the provisions of the 1897 law which read, ''each day a quantity of refined metal equal to ninety per centum of the amount of imported metal smelted or refined that day shall be set aside'' and retained under bond or exported, unless arrangements were made to pay the duty and enter the metal for domestic consumption. The taxpayer

---

[20]Section 312 provides in pertinent part: '' (a) Any plant engaged in smelting or refining, or both, of metal-bearing materials as defined in this section may, upon the giving of satisfactory bond, be designated a bonded smelting or refining warehouse. Metal-bearing materials may be entered into a bonded smelting or refining warehouse without the payment of duties thereon and there smelted or refined, or both together with metal-bearing materials of domestic or foreign origin. Upon arrival of imported metal-bearing materials at the warehouse they shall be sampled according to commercial methods and assayed both under customs supervision. The bond shall be charged with a sum equal in amount to the duties which would be payable on such metal-bearing materials in their condition as imported if entered for consumption, and the bond charge shall be adjusted to reflect changes in the applicable rate of duty occurring while the imported materials are still covered by the bond . . . (g) Labor performed and services rendered pursuant to this section shall be under the supervision of an officer of the customs, to be appointed by the Secretary of the Treasury and at the expense of the manufacturer. The Secretary of the Treasury is authorized to make such rules and regulations as may be necessary to carry out the provisions of this section.''

claimed that the act intended a subsidy of 10 percent of the refined metal actually recovered. The government insisted that the refined metal to be set aside was 90 percent of that originally assayed. In sustaining the government's position the court stated: "Our decision of this case might well be rested upon what has been said respecting the directly pertinent portion of section 29, but some of the extrinsic considerations which the record suggests will now be briefly referred to. It is undoubtedly true that the act of 1897 was intended not only 'to provide revenue,' but also 'to encourage the industries of the United States.' But this latter intent was effectuated by levying protective duties, and this its twenty-ninth section did not do. It did not impose, but excepted from duties, and this for a reason which is quite apparent. Metals imported and dealt with under its provisions do not enter into the markets of the United States, and consequently do not come into competition with any of their industries. This, we are convinced, was the real and only ground upon which the exemption to smelters and refiners was accorded, and there is nothing whatever in the act to support the contention that it was designed that this particular class of importers should, to any extent, be especially privileged to put upon the markets of the United States, free of duty, a commodity which, when imported by others, was by the same act made subject to duty. Such a purpose cannot be, upon mere conjecture, imputed to Congress. It would not be in furtherance of the protective policy of the act. It would be subversive of it. It would impair the efficacy of the repression interposed to encourage our industries, and in such manner as to give to some of them an advantage over others. We cannot concur in the view that the object of the provisions that only 90 per centum of the imported metal need be exported was to leave in the hands of those engaged in smelting or refining a bonus to foster or promote those industries. No such intent is expressed in the act, but, on the contrary, it clearly appears that protective duties, affecting all alike, were the only means by which it was proposed 'to encourage the industries of the United States,' and that nothing in the nature of a subsidy, bounty, or reward was intended to be bestowed upon any of them." (126 F., at pp. 730-731.) The court observed that the 10 percent was to allow for the loss which occurred in smelting or refining.

An examination of the law and the regulations promulgated

468

under it (19 C.F.R., §§ 19.17-19.25) reveals that the purpose of the creation of the bonded smelter is, as set forth in section 19.18, to carry out the following mandate. A quantity of dutiable metal equal to "[t]he full dutiable contents of such metal-bearing materials, as ascertained by commercial assay made by Government chemists, less the wastage allowance (including dutiable metals entirely lost in smelting or refining, or both) . . . must be either exported, duty-paid, or transferred to another bonded warehouse. . . ." In the classification of warehouses, the regulations recognize that the bonded smelter and refinery may treat imported metal-bearing materials for domestic consumption as well as for exportation.[21] The law (see fn. 20, *supra*) expressly recognizes that metal-bearing materials of both foreign and domestic origin may be processed. In dealing with the question of losses in production, the regulations require a statement of the metal-bearing materials worked during the fiscal year which "shall show the quantity of foreign materials and the quantity of domestic material put in process during the smelting operations." (§ 19.19, subd. (b).) Throughout it is recognized that the government's interest is in the "dutiable contents" of the material treated; by inference it is recognized that there may also be nondutiable contents. The determination of this dutiable content is of concern to the government, but after sampling and weighing there is no requirement that bonded metal-bearing materials shall be kept separate and distinct from nonbonded material.[22]

.Once the imported metal-bearing materials with dutiable contents have been sampled and weighed they become, although segregated in lots for technological reasons in processing, a part of the mass of material in the bonded warehouse. The government's interest thereafter is to insure that there is sufficient quantity of refined dutiable metal on hand at all times to cover the assayed dutiable contents of the metal-bearing materials received, until payment of duty on or export or transfer of that amount. There is no inherent reason

[21]19 C.F.R., section 19.1, provides in part, "(a) Customs warehouses shall be designated according to the following classifications: . . . (7) *Class 7*. Warehouses bonded for smelting and refining imported metal-bearing materials for exportation or domestic consumption." See also section 19.18, subd. (b) which regulates withdrawal for consumption upon the payment of duty.

[22]19 C.F.R. section 19.17, subdivision (f), provides: "Bonded metal-bearing materials shall be kept separate and distinct from nonbonded material until they have been sampled and weighed."

that a tax on the manufacturer's inventories of metal-bearing materials and refined metals of foreign origin will interfere with the government's interest any more than the concededly permissible taxes on the plant itself and on the metal-bearing materials and refined metals of domestic origin.

If the federal government's interest in protecting its revenue, as embodied in pertinent law and regulation, is considered as precluding the imposition of a tax on property of foreign origin, the dutiable contents of the metal-bearing material,[23] and the dutiable metal on hand of foreign origin would be excluded from assessment and tax. If the duties were paid because of a threatened rise in duties, or for some other reason, the dutiable property would then be subject to tax.[24] The mere incident of the time of payment of the federal duty, as controlled by the taxpayer, does not appear to be a rational criteria upon which to predicate the determination of the local government's right to tax. The security interest of the federal government should not affect the local government's right to tax any more than would a banker's pledge or chattel mortgage affect Ohio's right to tax the ore at Youngstown.

Furthermore, it should be noted that under the fungible property basis through which the federal government protects its right to duties, the property on hand as subject to bond may in fact originally have been of domestic origin.[25]

[23]The taxpayer contended and the court found that gold and other non-dutiable metals present in lead-bearing ores and concentrates are in United States Customs Bond so long as the dutiable lead in those ores and concentrates remains in United States Customs Bond. The taxing authorities assert (for the first time on appeal, according to the tax-payer) that the duty free metal in the metal-bearing material should be assessed and taxed in any event. As noted above, the federal government's interest is in the dutiable contents of the metal-bearing materials, and it is protected, not in reference to the raw material itself, but in reference to the refined dutiable metal on hand. The determination of the dutiable contents is made from samples taken on entry, and therefore could furnish a guide for determining what portion of the value of the property, if any, should be excluded from assessment and tax by the local government.

[24]The In-Process and Processed Inventories of materials of foreign origin which were *not* in United States Customs Bond were found to be as follows for the years in question: 1963, $1,011,873; 1964, $956,078; 1965, $969,177; and 1966, none.

[25]If the taxpayer's Custom Bond is charged with a quantity of dutiable metal at another refinery where it is not threatened with a property tax, and some metal of the same type of domestic origin is on hand at. Selby, it apparently may subject the latter to the Customs Bond and release the former for consumption. (See § 312, subd. (b), par. (5), and 19 C.F.R., § 19.24.)

The law and regulations governing bonded smelting and refining warehouses do not compel the conclusion that Congress in the exercise of its power to regulate foreign commerce has attempted to create a warehouse enclave of foreign commerce to provide a means whereby goods may be processed locally and (toll contracts aside) be subsequently sold and consumed in domestic commerce. All that appears is an intent to relieve the processor of the obligation to pay the duty until the refined product is actually consumed or sold in domestic commerce, and the intent to relieve him of the obligation to pay any duty if the refined product is exported. (Cf. § 313; 19 U.S.C.A., § 1313, which provides for refunds, as a drawback, where imported material upon which a duty has been paid is used in the domestic manufacture or production of goods which are exported.)

The gravitation to the principle of *Youngstown Sheet & Tube Co.* v. *Bowers, supra,* which the foregoing conclusions indicate, is not unchallenged. The development of the law governing bonded manufacturing warehouses (Tariff Act of 1930, § 311; 19 U.S.C.A., § 1311; and see 19 C.F.R., § 19.13-19.16) has produced a celestial body, which the lower court found drew this case into its orbit. In *McGoldrick* v. *Gulf Oil Co., supra,* 309 U.S. 414, the court struck down a New York City tax on the sale of fuel oil, manufactured in the city from imported crude petroleum, and sold as ships' stores to vessels engaged in foreign commerce. The fuel oil was manufactured from the imported crude oil under bond. The court examined the applicable statutes and concluded "that articles manufactured from imported articles and laden for use on vessels engaged in foreign commerce under customs regulation are to be duty free and considered or held as exported for the purpose of the drawback provisions. . . ." (309 U.S. at p. 425 [84 L.Ed. at p. 847]; see Tariff Act of 1930, § 309; 19 U.S.C.A., § 1309; Rev. Act of 1932 as amended May 28, 1938, §§ 601 and 630; ch. 209, 47 Stat. 169, ch. 289, § 705(a), 52 Stat. 570.) The court defined the status of the petroleum and the fuel oil as follows: "From the time of importation until the moment when the bunker 'C' oil is laden on vessels engaged in foreign trade, the imported petroleum and its product, the fuel oil, is segregated from the common mass of goods and property within the state, and is subject to the supervision and control of federal customs officers. It cannot lawfully be removed from the manufacturing warehouse except for delivery for use as fuel to a vessel engaged in

foreign commerce and it cannot lawfully be diverted from such destination and use and cannot, after delivery to the vessel, be landed in the United States. Throughout, the oil is subject to the obligation of respondent's bonds that it shall remain under such supervision and control and shall not be diverted from its ultimate destination as ships' stores." (*Id.,* at pp. 425-426 [84 L.Ed. at p. 847]; and see Tariff Act of 1930, § 311; 19 U.S.C.A., § 1311.)

In further examining the law and regulations, the court continued: "Article 942 of the Customs Regulations of 1931 provides that 'merchandise in bonded warehouse is not subject to levy, attachment, or other process of a State court . . .' and that 'imported goods in bonded warehouse are exempt from taxation under the general laws of the several States.' These regulations, continued in Customs Regulations of 1937, Art. 940, appeared as Art. 731, Regulations of 1915, and Art. 850 of Regulations of 1923. They were thus in force when the Tariff Act of 1930 was adopted and were incorporated by reference, cf. *McCaughn* v. *Hershey Chocolate Co.,* 283 U.S. 488, 492 [75 L.Ed. 1183, 1186, 51 S.Ct. 510], by the provisions of §§ 309, 311, already noted, which also adopted the earlier provisions of § 1351, Title 26, U.S.C., R.S. § 3433, and declared that articles manufactured from imported materials in bonded warehouse should be placed there under regulations prescribed by the Secretary of the Treasury." (*Id.,* at p. 426 [84 L.Ed.2d at p. 847]. Cf. 19 C.F.R., § 19.6, subd. (c), fn. 11.)[26]

The court concluded: "The provisions of the Revenue Act of 1932, read with those of the Tariff Act of 1930 and with the Statutes and regulations which we have mentioned, thus afford a comprehensive scheme for the regulation of the importation of the crude petroleum and of its control while in

---

[26]The regulations in effect presently, and in the years in question, contain the reference alluded to by the court among the general provisions (§§ 19.2-19.10) governing customs warehouses and control of merchandise therein in the following manner: "§ 19.6 Permits; releases. (a) . . . . (b) . . . . (c) Merchandise covered by a notice of lien filed by the carrier shall not be released until the lien has been satisfied or discharged.[11]

"[11]Imported goods in bonded warehouse are exempt from taxation or judicial process of any State or subdivision thereof. (See T.D. 50200)"

T.D. 50200 is the reported decision in the *Gulf Oil* case and is headed by a statement which recites "that fuel oil manufactured in bonded warehouse and free of duty on withdrawal for use as vessel's supplies is not subject to sales tax under state law in view of congressional policy."

the course of manufacture in bond into fuel oil and its delivery as ships' stores to vessels in foreign commerce, all calculated to insure the devotion of the manufactured oil exclusively to that purpose." (*Id.*, pp. 426-427 [84 L.Ed. at p. 847].)

"The question remains, whether the present tax conflicts with the Congressional policy adopted by the Acts of Congress which we have discussed. As we have seen, the exemption and drawback provisions were designed, among other purposes, to relieve the importer of the import tax so that he might meet foreign competition in the sale of fuel as ships' stores. In furtherance of that end Congress provided for the segregation of the imported merchandise from the mass of goods within the state, prescribed the procedure to insure its use for the intended purpose, and by reference confirmed and adopted customs regulations prescribing that the merchandise, while in bonded warehouse, should be free from state taxation. It is evident that the purpose of the congressional regulation of the commerce would fail if the state were free at any stage of the transaction to impose a tax which would lessen the competitive advantage conferred on the importer by Congress, and which might equal or exceed the remitted import duty." (*Id.*, pp. 428-429 [84 L.Ed. at p. 848].)

The taxing authorities seek, not to overrule, but to distinguish the *Gulf Oil* case. The taxpayer with equal ardor insists that the principles set forth above control the disposition of this case. The salient distinction is that the provisions governing a manufacturing warehouse, such as that in which the imported crude petroleum was manufactured into fuel oil in the *Gulf Oil* case, limit withdrawal and sale of the product to the export trade (see § 311, and 19 C.F.R., § 19.15), and, under *Gulf Oil*, to sale for ships' stores; whereas, under the provisions governing bonded smelting and refining warehouses, all or any part of the product may be introduced into domestic commerce when the duty, previously calculated and secured by the Customs Bond, is paid. (See, § 312, and 19 C.F.R., § 19.18.) In *Gulf Oil* the property and its resulting products were irrevocably destined for foreign commerce, or ships' stores as a concommitant of such commerce favored by Congress, from the time the crude petroleum was imported. In this case, after the imported metal-bearing material was weighed and sampled, the importer was free to deal with the material, with the possible exception of that received on toll

contracts, in any manner it wished, subject only to the payment of duty.[26a]

In *Gulf Oil* the combination of laws and regulations demonstrated and executed the congressional policy to relieve the importer of the import tax so that he might meet foreign competition in the sale of fuel as ships' stores. So here it may be assumed that Congress in providing for the discharge of the obligation to pay the duty when the refined metal is exported (see § 312, subd. (b), par. (1), and 19 C.F.R., § 19.20, subd. (a)) has intended that the importer should be able to compete with foreign smelters in international trade without being subjected to an import tax. The implementation of this policy is satisfied by the exemption of that portion of the metal-bearing material that is earmarked to be refined for export purposes.

It is urged that the congressional intent goes further; that Congress in providing for bonded smelting and refining warehouses intended to give refiners and smelters immunity from all local taxes and regulations so that they could more freely compete in smelting and refining metal-bearing materials of foreign origin which were destined for domestic consumption. Two questions suggest themselves: To what extent may Congress follow imports through domestic processing and sale to favor them over domestic goods? and, To what extent has it acted to so do? It is recognized that in the exercise of the granted powers over interstate and foreign commerce, the federal government through regulation of such commerce may impose demands which impinge upon intrastate commerce. (*Atlanta Motel* v. *United States* (1964) 379 U.S. 241, 253-262 [13 L.Ed.2d 258, 266-271, 85 S.Ct. 348].) The principles governing taxation, which have been reviewed above, suggest, however, that when the Constitution, as interpreted by the highest court, relieves goods of their status as imports or as

[26a]The taxpayer suggests that it had metals on hand on the respective lien days in excess of fixed import quotas, and that such metals could not be released into the stream of domestic commerce upon the payment of duty. (See 19 U.S.C.A., § 1202, Appendix to the Tariff Schedules, part 2, Temporary Modifications Proclaimed Pursuant to Trade-Agreement Legislation, Items 925.01-925.04 [pp. 545-546] fixing quarterly quotas for lead-bearing ores, zinc-bearing ores, unwrought lead and unwrought zinc which is the product of specified foreign countries.) Attention has not been directed to any finding or any evidence which reveals that these quotas in fact restricted the taxpayer's use of the property proposed to be taxed. The quotas were revoked October 22, 1965 (19 U.S.C.A. (1969 pocket part) pp. 99-100), and, in any event, could not affect that portion of the assessment for the current year, 1966-1967.

subjects of interstate commerce, the states' power to levy non-discriminatory taxes on such goods cannot be abrogated under the guise of federal regulation. It is unnecessary to pursue this concept. It encourages scrutiny of the laws and regulations to determine the congressional intent and action with respect to bonded smelting and refining warehouses. Such scrutiny does not reveal that Congress intended to relieve metal-bearing materials, not destined for foreign consumption, of nondiscriminatory taxation. If such were the intent, and if it were carried out, it would amount to a bounty to the operator of the tideland smelter processing metal-bearing materials of foreign origin which are destined for domestic consumption, and a discrimination against operators of domestic smelters refining domestic ores which are subject to local taxation.[27]

For these reasons, and for those set forth above in connection with the analysis of the statute and regulations, it is concluded that the laws and regulations relating specifically to bonded smelting and refining warehouses do not fall within the orbit of the *Gulf Oil* case, and confer an immunity from a nondiscriminatory tax on property of foreign origin being processed for domestic consumption.

The paragraphs in *Gulf Oil* referring to the Customs Regulations are said to establish as a matter of law that Congress has provided, " 'imported goods in bonded warehouse are exempt from taxation under the general laws of the several States.' " (See 309 U.S. at p. 426 [84 L.Ed. at p. 847], fn. 26, *supra,* and accompanying text.) The court did state, "These regulations . . . were thus in force when the Tariff Act of 1930 was adopted and were incorporated by reference [citation] by the provisions of §§ 309, 311, already noted. . . ." (*Id.*) In concluding, however, the following observa-

[27]It would then appear that Congress by imposing the duty, which is at the heart of the bonding process, intended to keep up a price to foster domestic production, and yet also intended to encourage the smelting and refining of foreign metal-bearing materials. If such processing is for export only it does not affect the market for domestic metals. On the other hand, if the processing is for domestic use, and the refined metals are sold under the protection of the duty, the combination of the duty and the subsidy can only serve to lower the price of the refined metal or enrich the operator of the tidewater smelter, because the metals presumably could be secured in the world market at the domestic price less the duty, without further subsidy to the producer. Moreover, if such a subsidy is desirable, the logical method of accomplishing the result would be to have lower duties on refined metals processed domestically from ore-bearing materials of foreign origin, than the duties on refined metals which have been processed abroad.

tion was made: "The customs regulation prescribing the exemption from state taxation, *when applied to the facts of the present case,* states only what is implicit in the congressional regulation of commerce *presently involved.*" (*Id.* at p. 429 [84 L.Ed. at pp. 848-849]; italics added.) The court thereby left open the question of whether the regulation in question applies to the facts of this case and the regulation of commerce of the type here involved. The warrant to examine the extent of the *Gulf Oil* ruling as to the weight to be accorded to, and the scope of the regulation, is further supported by the fact that the precedents upon which the regulation was based were of limited application,[28] and by the

[28]The phrase quoted by the court in *Gulf Oil* (309 U.S. at p. 426 [84 L.Ed. at p. 847]) is attributed first to Customs Regulations of 1915, article 731, which reads: "Art. 731. Control of merchandise in bonded warehouse.—Merchandise in bonded warehouse is subject only to the orders and decrees of the United States courts. It is not subject to levy, attachment, or other process of a State court, and collectors can not be enjoined by State courts from delivering such merchandise to importers or their assigns. The Government will not compel a warehouseman to deliver bonded goods, as the interest of the Government is in the collection of the duty on the merchandise or its exportation, and any question of infringement of private rights by the warehouseman must be left to parties in interest. Imported goods in bonded warehouse are exempt from taxation under the general laws of the several States." Marginal notes indicate the following authorities: "*Low* v. *Austin* [(1871) 80 U.S. 29 [20 L.Ed. 517]], 13 Wallace, 29; *Clarke* v. *Clarke* [*Clarke & Co.* v. *Clarke* (S.D. Ga., 1877)]; 3 Woods, 408; *Blount* v. *Munroe* [1878] 60 Ga. [62]; [*State*] v. *Pinckney* [S.C. 1857] 10 Rich. L., 474; and T.D. 21158." In *Low* v. *Austin, supra,* the taxpayers had paid the duties and charges on, and had removed from the custom house, imported wine, which they stored in the original cases in their own warehouses. The court followed the "original package doctrine" and concluded, "Imports, therefore, whilst retaining their distinctive character as such, must be treated as being without the jurisdiction of the taxing power of the State." (80 U.S. at p. 35 [20 L.Ed. at p. 519].) In *State* v. *Pinckney, supra,* the court adopted the opinion of the circuit judge which held that neither the commerce clause nor the import-export clause precluded a tax upon the sale of goods imported from a sister state. (10 Rich. L. at pp. 489-490, and see fn. 9, *supra.*) *Blount* v. *Munroe, supra,* approved the conclusion of the federal circuit court in *Clarke & Co.* v. *Clarke, supra,* that timber in the hands of an exporter, and under contract of sale for delivery to a foreign nation, which is at a seaport being shipped and awaiting shipment is exempt from tax under the import-export clause. (60 Ga. at pp. 68-69; and 3 Woods at p. 412.) In none of these cases is there any mention of customs duties, bonds or warehouses. In the Treasury decision, an 1899 letter of an Assistant Secretary of the Treasury, the author opined that "Municipal authorities cannot inspect records of customs houses for the purpose of procuring data of bonded goods of importers upon which to base city taxes."

The regulation, interpreted in the light of the precedents upon which it was based, means no more than that imported goods which are entitled to constitutional protection are exempt from state and local taxation while in a bonded warehouse. Significantly, the provisions in article 731

additional fact that there was no such regulation, but merely a footnote (see fn. 26, *supra*) in existence during the years of the proposed assessments in question in this case. It is concluded that the footnote has no more weight than the precedent upon which it rests; and that, to paraphrase the Treasury decision (see fn. 26, *supra*): Imported goods in bonded warehouses which are subject to withdrawal only for export or for use as ships' stores are exempt from taxation of any state or subdivision thereof. The law has gone no further.

The *Gulf Oil* case has been applied in this state. In *National Distillers etc. Corp.* v. *City & County San Francisco* (1956) 141 Cal.App.2d 651 [297 P.2d 61] (hearing denied by the Supreme Court July 18, 1956; cert.den. (1956) 352 U.S. 928 [1 L.Ed.2d 163, 77 S.Ct. 227]) the goods involved were cases of liquor "produced, bottled, packaged, labeled, stamped, and transported to California, and thence aboard ship for transportation to destinations in foreign countries or use as supplies of vessel in accordance with applicable federal laws and regulations and under the supervision and control of appropriate federal government agencies." (141 Cal.App.2d at p. 653.) Some cases of liquor were in a customs bonded warehouse, some were under an internal revenue bond in a public warehouse, and some were in a public warehouse subject to a drawback or refund of previously paid internal revenue taxes upon proof of export. (*Id.* at pp. 652-653.) "There was testimony that under the federal regulations it was not possible to sell any of this liquor domestically." (*Id.* at p. 653.) The court concluded: "The instant case seems to present a situation that is clearly within the rationale of the Gulf Oil case. Sections 309, 311 and 313 of the Tariff Act of 1930, as amended (tit. 19 U.S.C.A., §§ 1309, 1311 and 1313) provide

of the 1915 Regulations, and in article 850 of the 1923 Regulation are grouped with the regulations pertaining to storage warehouses, while the regulations for manufacturing and for smelting and refining bonded warehouses are in separately entitled groups. In the 1931 Regulations, the provisions, contained in article 942 are grouped with the general provisions and reentitled "merchandise in bonded warehouse is not subject to levy or attachment. . . ." Reference to United States Code, title 26, section 747, was inserted at the beginning of the article. The 1937 Regulations follow the same format.

Were it not for the *Gulf Oil* case, the conclusion that this sentence embodied in general instructions for the administration of bonded warehouses, could expand the exemption from state and local taxation beyond the constitutional premises upon which it was predicated would not be worthy of comment. In any event, as noted above, *Gulf Oil* does not require an interpretation extending the exemption beyond the constitutional mandate.

freedom from internal revenue taxes or for a drawback of taxes paid, when the required procedure is followed for domestic liquors exported, used as ships' stores, or sold to vessels employed in the fisheries. These provisions would seem to constitute regulations of foreign commerce in the instant case just as similar provisions did in the Gulf Oil case. Certainly the purpose of this regulatory scheme is to encourage commerce and give a competitive advantage to these items. If states or their political subdivisions were allowed to impose taxes on these items an interference with this purpose would result.'' (*Id.* at p. 656.)

It is clear that *National Distillers*, as does *Gulf Oil*, involves goods involved in the stream of exports which are not available for or connected with domestic commerce on the lien date.[29] The same is true of other cases in which a state has been restrained from interfering with the transit of liquor into foreign commerce, even against the contention that the Twenty-First Amendment gave the states greater powers than they otherwise would have. (*Hostetter* v. *Idlewild etc. Liquor Corp.* (1964) 377 U.S. 324 [12 L.Ed.2d 350, 84 S.Ct. 1293]; *Department of Alcoholic Beverage Control* v. *Ammex Warehouse Co. of San Ysidro, Inc.* (1964) 378 U.S. 124 [12 L.Ed. 2d 743, 84 S.Ct. 1657] (see 224 F.Supp. 546); and *Lordi* v. *Epstein* (1967) 389 U.S. 29 [19 L.Ed.2d 29, 88 S.Ct. 106] (see 261 F.Supp. 921).) In *Hostetter* the court observed, ''. . . it is not disputed that, if the commodity involved here were not liquor, but grain or lumber, the Commerce Clause would clearly deprive New York of any such power. [Citations:]'' (377 U.S. at p. 329 [12 L.Ed.2d at p. 354].) None of the cases cited depend upon a federal regulatory system for federal supremacy, but on the flow of goods in a stream of exportation.

Cases arising under the law governing Foreign Trade Zones (Act of June 18, 1934, ch. 590; 48 Stat. 998; 19 U.S.C.A., §§ 81a-81u) are not controlling or persuasive here. The statute indicates that Congress is cognizant of the manner in which it may directly create a true free trade enclave, and under those provisions has acted to do so. It has been determined that a

---

[29]The conclusion that the property on which the duty had been paid was exempted from taxation by federal regulation may be questioned. The other evidence, however, clearly demonstrated that although it could be sold domestically without loss to the federal revenue, it was not feasible to do so because of the manner in which it had been prepared and packaged.

state law requiring the licensing of those who are engaged in the business of soliciting sales of liquor does not apply to a business conducted within a free trade zone. (*During* v. *Valente* (1944) 267 App.Div. 383 [46 N.Y.S.2d 385, 387] ; and see *New York Foreign Trade Zone Operators* v. *State Liquor Authority* (1941) 285 N.Y. 272 [34 N.E.2d 316].) If it be assumed that state and local tax regulations may not reach into the enclave under any circumstances, that result would be predicated upon a broader statute than that which has been reviewed as applying to bonded smelters and refineries.

The Ohio cases of *Republic Steel Corp.* v. *Porterfield, supra,* 14 Ohio St.2d 101, and *Orr Felt & Blanket Co.* v. *Schneider, supra,* 3 Ohio St.2d 14, both involved goods imported for manufacture which were in bonded warehouses. In the latter case the court stated: "This court is of the opinion that with regard to the grease wool in the bonded customs warehouse of the taxpayer, *all phases of the importation journey had not ended,* as required to make an import subject to taxation by the principles stated in the *Yougstown Sheet & Tube Co.* case, and in *United States Plywood Corp.* v. *City of Algoma,* 2 Wis.2d 567 [87 N.W.2d 481], affirmed, 358 U.S. 534, 79 S.Ct. 388, 3 L.Ed.2d 490." (3 Ohio St.2d at pp. 23-24, [209 N.E.2d at p. 156].) This principle was followed in the *Republic Steel Corp.* case. (14 Ohio St.2d at p. 104 [236 N.E.2d at p. 664].) In concurring, Chief Justice Taft thought the case should turn upon the taxpayers' "current operational needs" because the Board of Tax Appeals had justifiably found, " '. . . the bond in question is in the nature of a surety bond to guarantee payment of custom duties and in no way limits or prohibits the use of the manganese ore by the appellant [the taxpayer] or by Union Carbide [the owner of the premises on which was located the bonded warehouse in which the taxpayer's manganese ore was stored, and the processor who withdrew the ore, smelted it, and delivered the necessary alloy to the taxpayer]." (*Id.* at p. 105 [*Id.* at p. 664].) Insofar as these cases rest upon the fact that a bond is outstanding on the property, as distinguished from a narrow interpretation of *Youngstown Co.* v. *Bowers* (see fn. 6, *supra,* and text following), they are rejected in favor of a solution which gives greater recognition to the rights of the state and local government, without infringing on constitutional or congressional restraints.

*Gulf Oil* was also considered in *Shell Oil Co.* v. *State Board*

*of Equalization* (1966) 64 Cal.2d 713 [51 Cal.Rptr. 524, 414 P.2d 820], in connection with the contention that congressional regulation of duties on fuel for ships' stores preempted the right of the state to levy a sales tax on domestic fuel sold for such purposes. The court recognized that the *Gulf Oil* case depended on the flow from import, through bond, to a use protected by Congress. It concluded "The *Gulf Oil* case demonstrates that Congress intended to occupy only a limited field outside of which state regulations are not forbidden or displaced." (64 Cal.2d at p. 728; and cf. *Rathjen Bros. Inc.* v. *Collins* (1942) 50 Cal.App.2d 774, 784-785 [123 P.2d 930], and *Gooderham & Worts, Ltd.* v. *Collins* (1942) 50 Cal.App.2d 716, 720-721 [123 P.2d 922], which, though practically extinguished by *National Distillers*, 141 Cal.App.2d at pp. 658-659, may be rekindled in part by *Shell Oil.* Cf. Comment (1966) 51 Minn.L.Rev. 151.)

On the taxing authorities' side there is some authority for the proposition that the use of a bonded warehouse to protect the government's interest in its revenue in and of itself will not prevent the imposition of a state or local tax on goods held for local use. ". . . the right of a state consistently with the Constitution of the United States to tax tangible property having a situs within its borders, irrespective of the residence of the owner, and to impose the duty on a warehouseman to pay a tax upon distilled spirits in his custody, even although the warehouse in which they were stored was bonded under the laws of the United States" has been consistently upheld. (*Hannis Distilling Co.* v. *Baltimore* (1910) 216 U.S. 285, 292 [54 L.Ed. 482, 485, 30 S.Ct. 326]; *Thompson* v. *Kentucky* (1908) 209 U.S. 340, 347 [52 L.Ed. 822, 827, 28 S.Ct. 533]. and *Carstairs* v. *Cochran* (1904) 193 U.S. 10, 16-17 [48 L.Ed. 596, 597, 24 S.Ct. 318].) The foregoing cases involve internal revenue, and not customs bonded warehouses. Nevertheless they establish the principle for which they have been cited. In this case, as demonstrated above once the incoming metal-bearing material has been weighed and sampled the government's interest in the property, with the exception of that which is appropriated for export, is solely in the collection of the duty as the metal processed from the ore goes forth into domestic commerce. (See *Minturn* v. *United States* (1882) 106 U.S. 437, 443 [27 L.Ed. 208, 210, 1 S.Ct. 402].)

The principle that goods may lose their status as imports

and become subject to local taxation despite the fact that they are subject to bond is suggested by several cases dealing with the importation of cattle under bond. In *State* v. *Harper* (Tex.Civ.App. 1945) 188 S.W.2d 400, cert.den. (1946) 327 U.S. 805 [90 L.Ed. 1030, 66 S.Ct. 964],[30] it was contended that the State of Texas could not recover ad valorem property taxes on cattle because they had been imported under bond. (Tariff Act of 1930, § 555; 19 U.S.C.A., § 1555; and see 19 C.F.R., § 19.1, subd. (a), par. (4).) The court stated, ''The appeal presents but one controlling issue, which may be stated as follows: Had the steers, bulls and stags, imported from Mexico by Harper, ceased to have the status of imports on January 1, 1942, so as to become subject to the tax which the State is attempting to collect?

''The fact that the customs duties had not been collected is not determinative of the issue, nor is the fact that the cattle were not released from the custody and control of the customs officers a deciding factor.'' (188 S.W.2d at p. 402.) It concluded: ''We can come to no other conclusion than that the rule to the effect that merchandise stored in a bonded warehouse in the original package is free from state and local tax simply does not apply to cattle running on the range. They are not merchandise, they are not stored, and they are not in original package within the meaning of the language used in the above rule. *Tres Ritos Ranch Co.* v. *Abbott, supra,* [(1940) 44 N.M. 556, 105 P.2d 1070, 130 A.L.R. 963] ; *In re Miller Land & Livestock Co., supra* [(D.Mont. 1944) 56 F.Supp. 34.]'' The cases cited in *Harper* do not throw much light on the question of whether the fact that the property is admitted under bond deprives the state of the right to tax because in each of those cases the court intimated that there had been no compliance with the requirements for creating a bonded warehouse of class 4 for the storage of livestock. In *In re Miller Land & Livestock Co., supra,* the taxpayer presented a letter setting forth the provisions of the last paragraph of article 940 of the Customs Regulations of 1937 (see fn. 26,

---

[30]The taxing authorities suggest that Chief Justice Stone, who had authored the *Gulf Oil* case six years earlier, would have clarified *Harper* if he had thought it necessary. This suggestion is of doubtful merit, particularly in view of the fact that the records of the Supreme Court reflect the following entry on the day certiorari was denied in *Harper*: ''Mr. Chief Justice Stone was stricken on the bench on April 22, 1946, and passed away during the evening of the same day.'' (327 U.S. at p. III.)

*supra,* accompanying text, and fn. 28), but the court concluded that in any event no bonded warehouse had actually been created. In *Tres Ritos Ranch Co.* the court did observe: "If a state cannot impose taxes after the United States customs have been paid so long as the imported article has not been commingled with the property of the state, then, conversely, a state can impose taxes before the United States customs have been paid whenever the imported article has been commingled with the property of the state. Payment of the duty is not the determinative factor." (44 N.M. at p. 563 [105 P.2d at p. 1074].) All three cases stand for the proposition that where there is more than mere storage in a manner reasonably consistent with the nature of the property, the protection of the import-export clause is lost.

It is concluded that neither the laws, nor the regulations, nor the precedents on which the taxpayer relies show a congressional intent to interfere with the right of the state to tax goods which have been imported for, and have been appropriated to, processing for domestic consumption, and that such right is not foreclosed because the importer-processor has withheld payment of the duty and has given a bond to secure such payment after the completion of the processing.

The doctrine of federal preemption does, however, offer a haven with respect to metal-bearing materials and the quantity of refined metal found therein that is the subject of toll contracts. It could be said, as noted above, that since no specific refined metal is appropriated for export until payment in specie is actually made, there is no property to exempt. The law and regulations particularly applicable to bonded smelting and refining warehouses imply that at the time metal-bearing materials are received under a toll contract and are weighed and sampled, the taxpayer is charged with the obligation to ultimately export the amount of refined metal called for by the contract. *Gulf Oil* suggests, if it does not compel, that an amount of refined metal in that quantity be treated as in the flow of import-processing-export, and be exempted from local taxation. This gives full weight to the regulatory aspects of the tariff laws and regulations, without unduly hampering the local government's right to be compensated from the fruits of domestic commerce.

*Federal Regulation of Gold*

The court found as an ultimate fact: "4. Petitioner is

licensed by the United States to refine gold at its Selby plant pursuant to the laws of the United States; petitioner accounts to the United States Treasury Department for all gold that enters its Selby plant and disposes of gold or gold-bearing materials only by re-export or by sale to the United States government or to private persons or concerns licensed by the United States Treasury Department to buy it.''

It concluded: ''2. A property tax on gold of either foreign or domestic origin, at petitioner's Selby plant, whether in ores and concentrates, in process of being refined or in completely refined form, is an unconstitutional invasion of an area preempted by the United States under Title 31, U.S. Code, and Regulations there authorized, and other United States statutes, and is therefore removed from state and local jurisdiction under the supremacy clause of the United States Constitution (Art. VI, cl. 2).''

The question concerns the domestic gold, in metal-bearing materials, in materials in process and as refined, and such gold as is received from foreign sources on other than toll contracts. Gold is not a dutiable metal, and the content in the metal-bearing materials is ascertained when the material is weighed and sampled upon entry (see fn. 23, *supra*). There may therefore be no ''Customs'' interest in the gold in process, even if it is to be reexported. The Gold Regulations, however, expressly deal with the subject of ''Gold imported in gold-bearing materials for re-export.'' (31 C.F.R., § 54.32.) Deference to the principle of *Gulf Oil* suggests that gold, as represented by equivalent refined specie, which is appropriated for reexport, at the time of the entry, should occupy a protected status as part of a flow of foreign commerce favored by Congress.

An examination of the provisions of the Gold Reserve Act of 1934 (Act of Jan. 30, 1934, ch. 6, 48 Stat. 337, and see 31 U.S.C.A., § 440 and sections referred to therein), and the regulations issued as authorized therein (Gold Reserve Act of 1934, ch. 6, § 3; 31 U.S.C.A., § 442; and 31 C.F.R., §§ 54.1-54.52) fails to sustain the conclusions of the trial court.

The validity of the act and the regulations has been established against objections raised on constitutional grounds. (*Laycock* v. *Kenney* (9th Cir. 1959) 270 F.2d 580, 585-593, cert.den. (1960) 361 U.S. 933 [4 L.Ed.2d 355, 80 S.Ct. 373].

See also *Norman* v. *Baltimore & O.R. Co.* (1935) 294 U.S. 240, 302-306 [79 L.Ed. 885, 899-890, 55 S.Ct. 407, 95 A.L.R. 1352] ; *Nortz* v. *United States* (1935) 294 U.S. 317, 329-330 [79 L.Ed. 907, 911-912, 55 S.Ct. 428, 95 A.L.R. 1346] ; *Perry* v. *United States* (1935) 294 U.S. 330, 355-356 [79 L.Ed. 912, 919-920, 55 S.Ct. 432, 95 A.L.R. 1335] ; and *Hunsaker* v. *United States* (9th Cir. 1960) 279 F.2d 111, 113.) The foregoing authorities demonstrate that the power ''to coin Money, regulate the Value thereof, and of foreign Coin'' conferred on Congress by article I, section 8, clause 5, of the Constitution extends to the control of gold, the metal, as well as gold in the form of a medium of exchange. In *Norman* v. *Baltimore & O.R. Co.,* *supra,* the court stated : ''Moreover, by virtue of this national power, there attach to the ownership of gold and silver those limitations which public policy may require by reason of their quality as legal tender and as a medium of exchange. *Ling Su Fan* v. *United States* [1910] 218 U.S. 302, 310 [54 L.Ed. 1049, 1050, 31 S.Ct. 21, 30 L.R.A. N.S. 1176]. Those limitations arise from the fact that the law 'gives to such coinage a value which does not attach as a mere consequence of intrinsic value.' Their quality as legal tender is attributed by the law, aside from their bullion value. Hence the power to coin money includes the power to forbid mutilation, melting and exportation of gold and silver coin,—'to prevent its outflow from the country of its origin.' *Id.,* p. 311 [54 L.Ed. at p. 1051].'' (294 U.S. at p. 304 [79 L.Ed. at p. 900].)

The law does not prohibit all traffic in gold as a metal, it merely authorizes the regulation of its acquisition and use.[31] The regulations are summarized in *Laycock* v. *Kenney, supra,* as follows : ''The present regulations issued by the Secretary

[31]Section 3 of the Gold Reserve Act of 1934 provides : ''The Secretary of the Treasury shall, by regulations issued hereunder, with the approval of the President, prescribe the conditions under which gold may be acquired and held, transported, melted or treated, imported, exported, or earmarked : (a) for industrial, professional, and artistic use ; (b) by the Federal Reserve banks for the purpose of settling international balances ; and (c) for such other purposes as in his judgment are not inconsistent with the purposes of sections 315b, 405b, 408a, 408b, 440-446, 752, 754a, 754b, 767, 821, 822a, 822b, and 824 of this title and sections 213, 411-415, 417, and 467 of Title 12. Gold in any form may be acquired, transported, melted or treated, imported, exported, or earmarked or held in custody for foreign or domestic account (except on behalf of the United States) only to the extent permitted by, and subject to the conditions prescribed in, or pursuant to, such regulations. Such regulations may exempt from the provisions of this section, in whole or in part, gold situated in places beyond the limits of the continental United States.'' (31 U.S.C.A. § 442.)

pursuant to this section are in essentially the same form as those originally issued under the Act. (See 31 C.F.R. ch. I, pt. 54.) They provide for a licensing system by which all gold in the United States, except in its natural state, is regulated. Section 12 of the regulations prohibits all dealing in gold or its processing except as expressly authorized in the regulations or as licensed in accordance with the regulations. Section 19 specifically authorizes the acquisition or transportation of gold within the United States in its 'natural state' without the necessity of holding a license. 'Natural state' is defined in Section 4 (11) as 'gold recovered from natural sources which has not been melted, smelted, or refined or otherwise treated by heating or by a chemical or electrical process.' But under Section 22 gold other than in the natural state can be 'acquired, held, transported, melted or treated, imported or exported, or earmarked for industrial, professional or artistic use only to the extent permitted by licenses issued to persons who have such need.' Therefore, . . . the possessor of gold ore—gold in its 'natural state'—can sell it freely within the United States. . . . [I]f the gold is processed in any way, it must be done under a license and sold only to persons licensed to purchase, or under Section 21, to persons not licensed, if they need only a specified small amount for use in industry, profession or art. Under Section 35, the United States mints are authorized to purchase gold, including that recovered from natural deposits in the United States. provided it has never been held at any time in noncompliance with the gold regulations, and has been 'acquired, held, melted or treated' in accordance with a duly issued Treasury license. Section 44 authorizes the mints to pay $35 per Troy ounce of fine gold, less mint charges, for all gold it purchases. Section 51 authorizes the mints to sell gold to persons licensed to purchase it at $35 per Troy ounce.'' (270 F.2d at pp. 585-586; and see 31 C.F.R., § 54.1, et seq.)

The taxpayer is licensed to "acquire and hold, transport, melt and treat, and import gold only for processing or disposition" in accordance with the terms of its license. The license provides that the smelter may dispose of the gold by processing or use in the industry, profession or art in which it is regularly engaged, by sale to a United States mint or Assay Officer, or by furnishing it to licensed persons.

Although all traffic in gold coinage has been prohibited and title to coins and bullion is vested in the United States (see

*Lilley* v. *Leggett* (1943) 61 Cal.App.2d 25, 28 [142 P.2d 57], and authorities cited), the federal government has not prohibited, but merely regulated, ownership and traffic in gold as a metal. In *Laycock* the court made the following observations about the ownership of the metal prior to the time it is sold to the government, ". . . appellant's argument that the enforcement of the regulations deprives her of property without due process of law is without merit. The Fifth Amendment, under which she asserts her rights, forbids the taking of property without just compensation or the deprivation of it without due process of law. But this provision refers only to direct appropriation. Here there has been none. Appellant is still free to deal with her property in any way she chooses limited only by the requirement that if gold should be extracted from the property it be disposed of in compliance with the regulations. Any hardship caused appellant by these regulations is not prohibited by the Fifth Amendment which 'has never been supposed to have any bearing upon or to inhibit laws that indirectly work harm and loss to individuals. A new tariff, an embargo, a draft, or a war, may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless. . . . But whoever supposed that because of this a tariff could not be changed or a non-intercourse Act, or an embargo be enacted, or a war be declared?' *Knox* v. *Lee, supra,* 12 Wall. [457] 549, 552, 20 L.Ed. 287. The quoted language is equally applicable to appellant's situation." (270 F.2d at p. 592.)

A series of cases dealing with the power of the federal government to regulate interstate commerce supports the conclusion that the laws and regulations governing traffic in gold do not render the metal government property, or indicate that the mining and treatment of gold bearing ore is not normal commerce. (Cf. *Fox* v. *Summit King Mines* (D.Nev. 1943) 48 F.Supp. 952, 954, and *Holland* v. *Haile Gold Mines* (W.D.S.C. 1942) 44 F.Supp. 641, 643, with *Fox* v. *Summit King Mines* (9th Cir. 1944) 143 F.2d 926, 928-929; *Walling* v. *Haile Gold Mines* (4th Cir. 1943) 136 F.2d 102, 103-104; and *Canyon Corp.* v. *National Labor Relations Board* (8th Cir. 1942) 128 F.2d 953, 954-955.) At the appellate level the courts have consistently recognized that there was still commerce in gold. In *Fox* the Circuit Court of Appeals stated: "The Treasury Department has, by appropriate regulations, authorized the sale of refined gold by producers, under proper

licenses, to certain private users throughout the country for industrial, professional and artistic purposes. We cannot agree with appellee's construction that the Gold Reserve Act makes its products non-commercial in character.'' (143 F.2d at p. 929.)

In 1906 Congress passed ''An Act Forbidding the importation, exportation, or carriage in interstate commerce of falsely or spuriously stamped articles of merchandise made of gold or silver or their alloys, and for other purposes.'' (June 13, 1906, ch. 3289, 34 Stat. 260, 15 U.S.C.A., §§ 294-300.) Section 7 of that act (15 U.S.C.A., § 300) reads as follows: ''All articles of merchandise to which sections 294-300 of this title apply which shall have been transported into any State, Territory, District, or possession of the United States, and shall remain therein for use, sale, or storage, shall, upon arrival in such State, Territory, District, or possession, be subject to the operation of all the laws of such State, Territory, District, or possession of the United States to the same extent and in the same manner as though such articles of merchandise had been produced in such State, Territory, District, or possession, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise.'' The taxpayer contends that this section indicates that Congress understood and intended that the right of the states to tax or regulate traffic in gold was otherwise preempted. Since the statute only purports to prohibit the false marking of articles of merchandise made in whole or in part of gold or silver, and does not refer to refined metal, and since it was adopted over a quarter of a century before the more rigid laws and regulations dealing with gold as a metal, it is completely irrelevant to the question at issue in this case.

The taxpayer's contention that a tax on the gold held by it in metal-bearing materials, in materials in process, and as refined metal is improper because it is a tax on property of the United States must be rejected. This conclusion makes it unnecessary to determine whether the tax could be upheld as a levy upon the taxpayer's possessory interest in government property. (Cf. *City of Detroit* v. *Murray Corp.* (1958) 355 U.S. 489 [2 L.Ed.2d 441, 78 S.Ct. 458], with *United States* v. *Allegheny County* (1944) 322 U.S. 174 [88 L.Ed. 1209, 64 S.Ct. 908].)

In *United States* v. *Allegheny County, supra,* the court found that the substance of the procedure was to lay an ad

valorem general property tax on property owned by the United States. (322 U.S. at p. 185 [88 L.Ed. at p. 1218].) The court stated: ''This taxation plan involves the identification and valuation of the variable individual holdings to be taxed, commonly called the assessment, the application of a uniform rate calculated on the need for public revenues, and the collection, in default of payment, by distraint and sale of the property assessed and taxed. This form of taxation is not regarded primarily as a form of personal taxation but rather as a tax against the property as a thing. Its procedures are more nearly analogous to procedures *in rem* than to those *in personam*. While personal liability for the tax may be and sometimes is imposed, the power to tax is predicated upon jurisdiction of the property, not upon jurisdiction of the person of the owner, which often is lacking without impairment of the power to tax. In both theory and practice the property is the subject of the tax and stands as security for its payment.'' (*Id.* at p. 184 [88 L.Ed. at p. 1218].) Here the taxpayer urges that the taxing authorities could not collect the tax by appropriating the gold itself because they are not licensed to traffic in it, and that therefore the power to tax should be denied. There is nothing, however, to prevent the local government from enforcing its right to any taxes which may be assessed against the proceeds of the gold. (See *Lilley* v. *Leggett, supra,* 61 Cal.App.2d at pp. 27-28.) In any event the taxes may be a lien on the taxpayer's real property. (See Rev. & Tax. Code, § 2189.)

The taxpayer again urges that the levy of the tax will impinge on the federal regulatory scheme because the imposition of the tax will increase the costs of production and lessen the supply of gold so urgently needed by the federal government. The burden is caused by the federal government's fixed price. The record does not in fact indicate whether production or profits will suffer by payment of the tax. No interference with the exercise of the prerogatives of the federal government is found. The situation is analogous to the highly regulated liquor business. The exercise of a constitutional power to regulate has not relieved the goods of the burden of taxation. (*Three G. Distillery Corp.* v. *County of Los Angeles* (1941) 46 Cal.App.2d 498, 501-503 [116 P.2d 143].)

It is concluded that the gold, other than that appropriated to the satisfaction of contracts which obligate the taxpayer to export and return the refined product or its equivalent in

specie, is subject to assessment and tax in whatever form it is found on the lien day.

*Conclusion*

The value of all minerals in metal-bearing materials on hand and in process, and of refined metals on hand, other than refined metals appropriated for the satisfaction of toll contracts or otherwise unconditionally appropriated for re-export (see fn. 6, *supra*) are subject to assessment and tax.

The judgment is reversed and the case is remanded for revision of the findings of fact, conclusions of law and judgment in accordance with the views herein set forth.

Molinari, P. J., and Elkington, J., concurred.

A petition for rehearing was denied on April 29, 1969, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied July 2, 1969.